ACCEPTED
02-17-00358-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
12/21/2017 11:10 AM
DEBRA SPISAK
CLERK

## NO. 02-17-00358-CV

**In the Court of Appeals
Second District of Texas
Fort Worth, Texas**

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
12/20/2017 12:00:00 AM
DEBRA SPISAK
Clerk

**City of White Settlement, Texas, and White Settlement Economic Development Corporation**

**Appellants,**

**v.**

**Benjamin S. Emmons, and Source Capital, LLC,**

**Appellees.**

*On Appeal from the 48th Judicial District Court of Tarrant County, Texas
Cause No.048-288516-16; the Honorable David L. Evans Presiding*

## APPELLANTS' BRIEF

Robert F. Maris
State Bar No. 12986300
rmaris@marislanier.com
Alise N. Abel
State Bar No. 24082596
aabel@marislanier.com
MARIS & LANIER, P.C.
3710 Rawlins Street, Suite 1550
Dallas, Texas 75219
214-706-0920 telephone
214-706-0921 facsimile

ATTORNEY FOR APPELLANTS

NO. 02-17-00358-CV

In the Court of Appeals
Second District of Texas
Fort Worth, Texas

City of White Settlement, Texas, and White Settlement Economic
Development Corporation

Appellants,

v.

Benjamin S. Emmons, and Source Capital, LLC,

Appellees.

*On Appeal from the 48th Judicial District Court of Tarrant County, Texas
Cause No.048-288516-16; the Honorable David L. Evans Presiding*

APPELLANTS' BRIEF

Robert F. Maris
State Bar No. 12986300
rmaris@marislanier.com
Alise N. Abel
State Bar No. 24082596
aabel@marislanier.com
MARIS & LANIER, P.C.
3710 Rawlins Street, Suite 1550
Dallas, Texas 75219
214-706-0920 telephone
214-706-0921 facsimile

ATTORNEY FOR APPELLANTS

ORAL ARGUMENT REQUESTED IF PERMITTED BY COURT

## IDENTITY OF PARTIES & COUNSEL

**Plaintiffs in the trial court and Appellants herein:**

City of White Settlement, Texas

White Settlement Economic Development Corporation

**Attorneys for Plaintiff in the trial court and Appellants on appeal:**

Robert F. Maris
State Bar No. 12986300
rmaris@marislanier.com
Alise N. Abel
State Bar No. 24082596
aabel@marislanier.com
MARIS & LANIER, P.C.
3710 Rawlins Street, Suite 1550
Dallas, Texas 75219
(214) 706-0920 telephone
(214) 706-0921 facsimile

**Defendants in the trial court and Appellees herein:**

Benjamin S. Emmons

Source Capital, LLC

**Additional Defendants in the trial court but not a party on appeal:**

Hawaiian Parks-White Settlement, LLC

Clinton Hill

**Attorney for Defendant in the trial court and Appellees on appeal:**

C. Michael Moore
State Bar No. 14323600
Matthew T. Nickel

State Bar No. 24056042
Spencer Hamilton
State Bar No. 24087656
DENTONS US LLP
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201

**Trial Court:**

The Honorable David Evans
48th Judicial District Court
Tarrant County Courts Building

## STATEMENT REGARDING ORAL ARGUMENT

Appellants City of White Settlement, Texas ("White Settlement") and White Settlement Economic Development Corporation ("White Settlement EDC") feel that oral argument, if allowed, would give the Court a more complete understanding of the facts presented in this appeal. Therefore, Appellants request the opportunity to present an oral argument.

# TABLE OF CONTENTS

Identity of Parties & Counsel ................................................................................. 1

Statement Regarding Oral Argument ..................................................................... 2

Table of Contents ..................................................................................................... 3

Index of Authorities ............................................................................................... 5

Statement of the Case .............................................................................................. 8

Statement of Jurisdiction ...................................................................................... 10

Statement of Issues Presented for Review .......................................................... 11

Statement of Facts and Background ..................................................................... 11

Summary of the Argument ................................................................................... 19

Argument & Authorities ....................................................................................... 20

Appellants' Issue No. 1:

      THE TRIAL COURT ERRED IN GRANTING EMMONS AND
      SOURCE CAPITAL'S FIRST AMENDED VERIFIED
      SPECIAL APPEARANCE ................................................................................. 20

      A.    Standard of review ............................................................................. 20

      B.    Emmons and Source Capital have minimum contacts with
             the State of Texas ............................................................................... 22

            i. General Jurisdiction ...................................................................... 24
            ii. Specific Jurisdiction .................................................................... 24

            iii. Source Capital's Contacts with the State of Texas ................... 25
            iv. Benjamin S. Emmons' Contacts with the State of
                Texas ............................................................................................ 30

      C.    The exercise of jurisdiction comports with fair play and
             substantial justice ............................................................................. 35

Conclusion & Prayer ................................................................... 37

Certificate of Compliance ........................................................... 40

Certificate of Service ................................................................. 40

Appendix ................................................................................. 41

# INDEX OF AUTHORITIES
*Case Law*                                                                                              *Page*

*BMC Software Belg. N.V. v. Marchand,*
83 S.W.3d 789 (Tex. 2002)..........................................................................21

*Carlile Bancshares, Inc. v. Armstrong,*
2014 WL 3891658 at *13 (Tex.App.- Fort Worth Aug. 7, 2014, no pet.).......33,34

*Cornerstone Healthcare Group Holding, Inc. v. Nautic Mgmt.,*
2016 WL 3382159 at *6 (Tex. June 17, 2016)...........................................26,27

*Daimler AG v. Bauman,*
134 S.Ct.746 (2014)...................................................................................24

*Flanagan v. Royal Body Care, Inc.,*
232 S.W.3d 367 (Tex.App.- Dallas 2007, pet. denied)..................................20

*Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,*
960 S.W.2d 41 (Tex. 1998)............................................................32

*Fox Lake Animal Hospital PSP v. Wound Management Technologies, Inc.,*
2014 WL 1389751 at *5 (Tex.App.- Fort Worth April 10, 2014, pet. denied).......35

*Glencoe Capital Partners II, LP v. Gernsbacher,*
269 S.W.3d 157(Tex.App.- Fort Worth 2008, no pet.)................25,33,36,37

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
564 U.S. 915, 924 (2011).............................................................24

*Guardian Royal Exchange Assurance, LTD. v. English China Clays. P.L.C. et al,*
815 S.W.2d 223 (Tex.1991)........................................................36

*Holloway v. Skinner,*
898 S.W.2d 793 (Tex.1995).........................................................26

*Horizon Shipbuilding, Inc. v. Blynn II Holding, LLC.,*
324 S.W.3d 840 (Tex.App.-Houston [14th Dist.] 2010, no pet.)................27,28

*Hoskins v. Ricco Family Partners, Ltd.,*
2016 WL 2772164 at *8 (Tex.App.- Fort Worth May 12, 2016, no pet.) .... .....21,25

*Jani-King Franchising, Inc. v. Falco Franchising, S.A.,*
2016 WL 2609314 at *2 (Tex.App.- Dallas May 5, 2016, no pet.)...................31

*Kelly v. Gen. Interior Constr., Inc.,*
301 S.W.3d 653 (Tex. 2010)........................................................20,21

*Michiana Easy Livin' Country, Inc. v. Holten,*
168 S.W.3d 777 (Tex. 2005)......................................................23

*Moki Mac River Expeditions v. Drugg,*
221 S.W.3d 569 (Tex. 2007).............................................,20,22,23

*Moncrief Oil Intern. Inc. v. OAO Gazprom,*
414 S.W.3d 142 (Tex. 2013).....................................23,24,25,26,27,32,36,37

*Mountain States Employers Council, Inc. v. Cobb Mechanical Contractors, Inc.,*
2008 WL 2639711 at *3 (Tex.App.- Fort Worth July 3, 2008, no pet.)...............22

*Norstrud v. Cicur,*
2015 WL 4878716 at *2 (Tex.App. Fort Worth, no pet.)...........................20,34

*Patel v. Pate,*
2017 WL 2871684 at *5 (Tex.App.- Fort Worth July 6, 2017, no pet.)................28

*Retamco Operating Inc., v. Republic Drilling Co.,*
278 S.W.3d 333, 357 (Tex. 2009).................................................20

*SITQ E.U., Inc. v. Reata Restaurants, Inc.,*
111 S.W.3d 638 (Tex.App.- Fort Worth 2003, pet. denied)..........................31

*Stull v. LaPlant,*
411 S.W.3d 129 (Tex.App.- Dallas 2013, no pet.).................................31

*360-Irvine, LLC v. Tin Star Development, LLC,*
2015 WL 3958509 at *5 (Tex.App.- Dallas June 30, 2015, no pet.).................26

**STATUTES**                                                             **PAGE**

TEX. CIV. PRAC. & REM. CODE §51.014(a)(7)..................................10

TEX. CIV. PRAC. & REM. CODE §17.042 .................................22

TO THE HONORABLE JUSTICES OF THIS COURT:

NOW COMES, Appellants City of White Settlement, Texas ("White Settlement") and White Settlement Economic Development Corporation ("White Settlement EDC") (collectively the "City") and submit their appellants' brief in the above-styled and -numbered appeal and respectfully show:

## STATEMENT OF THE CASE

*Nature of the Case*:

1. The City sued two residents of state of Georgia: (1) Benjamin S. Emmons ("Emmons") and Source Capital, LLC ("Source Capital") in the 48th District Court in Tarrant County.[1] The City asserts that the trial court incorrectly granted both Emmons' and Source Capital's Special Appearances.

2. This case involves a water park which was built and located in White Settlement.[2] The City contends that Emmons and Source Capital breached a contract with the City and made numerous representations that were either fraudulent or negligent while in Texas.[3] The contract and representations relate to the operations

---

[1] CR. 286-307.

[2] CR. 286-307.

[3] *Id.*

of the water park. The City also contends that Emmons caused equipment and arcade games to be removed from the water park and sold despite being owned by the City.[4]

*Course of Proceedings:*

3. This case was initiated on October 27, 2016.[5] On February 23, 2017, Emmons and Source Capital filed their First Amended Verified Special Appearance alleging that the trial court did not have jurisdiction as Emmons was not a resident of Texas and Source Capital was principally located in Atlanta, Georgia.[6] Appellants filed their First Amended Petition on April 7, 2017[7] and their Second Amended Petition on May 5, 2017[8]. Appellants filed their original response to the Special Appearance on May 8, 2017.[9] An amended response was filed by Appellants on August 30, 2017.[10] Emmons and Source Capital filed an amended reply on

---

[4] CR. 301-302.

[5] CR. 5-61.

[6] CR. 144-220.

[7] CR. 221-285.

[8] CR. 286-351.

[9] CR. 352-361.

[10] CR. 586-960.

September 6, 2017.[11] The special appearance was then submitted to the trial court without a hearing.[12]

*Trial Court's Disposition:*

4. On October 2, 2017, the trial court entered its Order sustaining the special appearance and dismissing Emmons and Source Capital from the suit for lack of personal jurisdiction.[13]

5. On October 20, 2017, Appellants filed their Notice of Appeal.[14] The remaining claims are currently abated pending resolution of this appeal.[15]

## STATEMENT OF JURISDICTION

This Court has jurisdiction of this interlocutory appeal pursuant to Tex. Civ. Prac. & Rem. Code 51.014(a)(7) to review the order granting the special appearances of Emmons and Source Capital.

---

[11] CR. 965-1036.

[12] CR. 580-584.

[13] CR. 1037

[14] CR. 1040-1041.

[15] TEX. CIV. PRAC. & REM. §51.014(b).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**Issue 1:**     The trial court erred in granting Emmons and Source Capital's First Amended Verified Special Appearance

## STATEMENT OF FACTS AND BACKGROUND

1.     Source Capital is a private equity firm which makes both equity and debt investments in businesses which span over a wide range of industries.[16] Emmons was and is a partner and a Managing Director of Source Capital.[17] Beginning in 2013, Source Capital caused the Source Capital Lenders[18] to make a $3.5 million loan to Horizon Family Holdings, LCC ("Horizon").[19] Horizon is a Missouri based holding company but does business in the state of Texas.[20] Prior to receiving the loan from Source Capital, Horizon had obtained a loan from Capital One Bank in Fort Worth.[21]

2.     The loan made by the Source Capital Lenders was to be repaid from the

---

[16] CR 289.

[17] CR 292.

[18] Source Capital Lenders are various investment funds which are pooled together.

[19] CR. 289.

[20] CR 289, 291.

[21] CR. 291.

operations of Horizon's seven waterparks in Texas (the "Seven Water Parks").[22] Emmons was directly involved in the negotiation of the $3.5 million dollar loan and made numerous visits to Texas and regularly communicated with individuals in Texas concerning the loan and the Seven Water Parks.[23] Each of the water parks was owned by a different city in the State of Texas: White Settlement, Waco, Garland, Pflugerville, Roanoke, The Colony, and Mansfield (the "Seven Cities").[24] Horizon had a long term lease with each City with each of the Seven Cities.[25] Matthew Smith, the Vice President of Source Capital, was also directly involved and frequently communicated with individuals in Texas and made numerous visits to Texas.[26]

3.      Construction began on the waterpark in White Settlement in 2013.[27] The City entered into both a Construction Agreement and Lease and Operating Agreement with Hawaiian-Parks White Settlement, LLC ("HParks").[28] HParks is

---

[22] CR 289.

[23] CR. 293.

[24] CR. 289.

[25] CR. 289.

[26] CR. 293.

[27] CR 289.

[28] CR 290.

owned by Horizon.[29] Emmons has represented that Source Capital or its affiliate, Source Horizon, LLC, is the controlling owner of Horizon.[30]

4.      The City provided $12,500,000 in funding for the construction of the water park in White Settlement which was to be paid back through semi-annual lease payments.[31] Despite some setbacks, the water park at White Settlement opened on or about May 24, 2014.[32] Unfortunately, by late 2014, HParks went into default on White Settlement's Lease and Operating Agreement.[33] Horizon also went into default on its loans with Source Capital.[34] Due to these defaults, many of the Seven Cities, including the City, threatened to terminate their leases.[35] If the leases were terminated, Source Capital would not be able to obtain repayment of their original $3.5 million loan.[36]

---

[29] CR 289.

[30] CR 289.

[31] CR 290-291.

[32] CR 291.

[33] CR. 292.

[34] CR. 292.

[35] CR. 292

[36] CR 292.

5.	In an attempt to ensure that Source Capital was paid back for the $3.5 million dollar loan, Emmons, representing Source Capital, negotiated a workout agreement with Capital One Bank as well as the Seven Cities who owned the Seven Water Parks (the "Workout Agreement").[37] Capital One Bank was Horizon's senior lender and Source Capital's loan was subordinate to the Capital One Bank loan.[38]

6.	The principle features of the Workout Agreement are as follows:

a.	Capital One Bank would enter into a forbearance agreement whereby the Bank would refrain from foreclosing before the end of 2015;

b.	Source Capital would advance an additional 5 million dollars to pay past due rents due on the waterpark leases and to operate the Seven Water Parks through the end of 2015;

c.	Source Capital would refinance the debt of Horizon by the end of 2015 or sell the parks and pay off the debts of Horizon.[39]

7.	From late 2014 through May 2015, Emmons and Source Capital were

---

[37] CR. 293; Appendix Tab 2.

[38] CR. 291.

[39] Appendix Tab 2.

attempting to persuade the Seven Cities to agree to the Workout Agreement.[40] During this time period, Emmons initiated and participated in many telephone conversations with representatives of Capital One Bank, Horizon and the Seven Cities.[41] Emmons also made numerous visits to the State of Texas to meet with representatives of Capital One Bank, Horizon as well as officials at the City of White Settlement.[42]

8.     The Workout Agreement was only possible if the Seven Cities would agree to changes in the debt structure and agree to defer their ability to exercise the rights and remedies under the Lease and Operating Agreements even though their Lease and Operating Agreements were in default.[43] The willingness of the Seven Cities to forebear exercising their rights generated by Horizon's default was key to the success of the Workout Agreement.[44]

9.     In early 2015, Emmons met with White Settlement officials to discuss

---

[40] CR. 294

[41] CR. 294.

[42] CR. 294.

[43] CR. 294.

[44] CR. 294.

the Workout Agreement.[45] This meeting occurred in White Settlement, Texas.[46] At this meeting, Emmons sought the City's approval of a Consent to Mortgage of Leasehold of the Park (the "Mortgage Consent").[47] Emmons represented to the City that this Mortgage Consent would benefit the City and that Capital One Bank would only extend its lending transaction if the Mortgage Consent was signed by the City.[48]

10.    In addition to the Mortgage Consent, at the meeting Emmons requested that the City agree to a Consent to a future Change of Ownership (the "Ownership Consent").[49] This Ownership Consent would allow for the transfer of ownership from Horizon to Source Horizon, LLC which is a Georgia limited liability company that is affiliated with Source Capital.[50] Emmons represented that Source Capital would inject up to $5,000,000 into Horizon for the benefit of the Seven Water Parks and that this cash injection, together with an additional cash injection of $1,000,000 by Source Capital and Capital One Bank, would ensure that Horizon could resolve

---

[45] CR. 294.

[46] CR. 294.

[47] CR. 295.

[48] CR. 295.

[49] CR. 295.

[50] CR. 295.

all of its 2014 hold-over obligations and handle its 2015 commitments including the $600,000 rent payment which was due to the City in October 2015.[51]

11. As the City did not timely and fully receive the first and second lease payments, the City was concerned about HParks' financial health and viability.[52] The City had no reason to agree to the Mortgage Consent or Ownership Consent unless the cash infusions were made by Source Capital and would benefit the City.[53] At the meeting in White Settlement, Emmons specifically represented to the City that if the Mortgage Consent was given by the City, the October 1, 2015 lease payment to the City would be paid.[54] This representation was material and was relied upon by the City. Based on these representations by Emmons and Source Capital, the City agreed to the Mortgage Consent and Ownership Consent.[55]

12. After the Mortgage Consent and Ownership Consent were agreed to the City, Emmons' representations proved to be untrue as Emmons and Source Capital

---

[51] CR. 295.

[52] CR. 296.

[53] CR. 296.

[54] CR. 296.

[55] CR. 296.

determined that the water park in White Settlement was not financially viable.[56] As such, Emmons and Source Capital engaged in the following activities which reduced the financial commitment to the water park:

    a. Only 3.7 million of the 5 million promised was advanced for the debt service and operation of the Seven Water Parks;

    b. All of the Seven Water Parks' rent payments through 2015 were paid except for White Settlement; the $600,000 rental payment was purposefully not paid;

    c. $300,000 in operating income generated at White Settlement was diverted to support the other six water parks in Texas;

    d. No efforts were made to maintain the White Settlement water park;

    e. Efforts to pay outstanding vendor indebtedness were delayed or halted, resulting in mechanic's liens;

    f. Adequate insurance was not maintained at the water park; and

    g. Emmons caused the arcade games and other equipment owned by White Settlement from the park to be removed from the water park. The

---

[56] CR. 297.

arcade games and equipment were valued at over $276,000.[57]

13.     When it became clear that the City would not receive the $600,000 lease payment, the City terminated the Lease and Operating Agreement.[58] This lawsuit was then brought against Emmons and Source Capital as well as HParks and Clinton Hill for various causes of actions relating to the facts and circumstances outlined above.[59] Specifically, the City brought suit against Emmons for conversion and violation of the Texas Theft Liability Act, and both Emmons and Source Capital for fraud, negligent misrepresentation, breach of contract, and promissory estoppel.[60]

## SUMMARY OF THE ARGUMENT

The trial court erred in granting Emmons and Source Capital's First Amended Verified Special Appearance because both Emmons and Source Capital had purposeful contacts with the State of Texas to give rise to personal jurisdiction. The City provided the trial court with adequate evidence of the quality and quantity of the purposeful contacts, which directly relate to the claims in this case. None of these

---

[57] CR. 296-97.

[58] CR. 298.

[59] *See* CR. 286-307.

[60] CR. 301-305.

contacts were legally or factually negated by either Emmons or Source Capital. Therefore, it was impermissible for the trial court to grant Emmons' and Source Capital's Special Appearance.

**ARGUMENT & AUTHORITIES**

**Issue No. 1:** *The trial court erred in granting Emmons and Source Capital's First Amended Verified Special Appearance*

**A.     Standard of review**

1.     The granting of a special appearance is reviewed *de novo*. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The court may draw factual allegations from the plaintiff's petition and any response opposing the special appearance. *See Flanagan v. Royal Body Care, Inc.*, 232 S.W.3d 367, 374 (Tex.App.- Dallas 2007, pet denied). The plaintiff has the initial burden of sufficiently pleading facts to confer jurisdiction. *Retamco Operating Inc., v. Republic Drilling Co.*, 278 S.W.3d 333, 357 (Tex. 2009). "This minimal pleading requirement is satisfied by an allegation that the nonresident defendant is doing business in Texas." *Norstrud v. Cicur*, 2015 WL 4878716 at *2 (Tex.App. Fort Worth, no pet.).

2.     The nonresident defendant is then able to negate jurisdiction on either a factual or legal basis. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659

(Tex. 2010). Factually, a defendant can allege that it does not have any contacts with the State of Texas. *Id.* Legally, the defendant can demonstrate that even if the facts are true, the evidence is not sufficient to establish jurisdiction in that either the contacts were not purposeful; the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction. *Id.*

3.     The general statement that the nonresident defendant has not "committed a tort, in whole, or in part, in Texas" is conclusory and therefore insufficient to shift the burden to the plaintiff to produce evidence of the specific allegations that give rise to jurisdiction. *Hoskins v. Ricco Family Partners, Ltd.*, 2016 WL 2772164 at *8 (Tex.App.- Fort Worth May 12, 2016, no pet.). Notably, "[j]urisdiction cannot turn on whether a defendant denied wrongdoing- as virtually all will." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 791 (Tex. 2005).

4.     When a trial court does not issue findings of fact and conclusions of law, as in this case, the court of appeals is to imply that the trial court found all facts necessary to support the judgment. *BMC Software Belg. N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). The implied findings of the trial court may be challenged for both their legal and factual sufficiency on appeal. *Id.*

5. In this case, Emmons and Source Capital do not deny that they both had contacts with the State of Texas. Instead, Emmons and Source Capital allege that the contacts were not sufficient to give rise to the level of minimum contacts.

**B. Emmons and Source Capital had minimum contacts with the State of Texas**

1. A Texas court can exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions,* 221 S.W.3d at 574.

2. The Texas long-arm statute allows a court to exercise jurisdiction over a non-resident defendant who "does business" in Texas. TEX. CIV. PRAC. & REM. CODE §17.042; *Mountain States Employers Council, Inc. v. Cobb Mechanical Contractors, Inc.,* 2008 WL 2639711 at *3 (Tex.App.- Fort Worth July 3, 2008, no pet.). Pursuant to section 17.042 of the Texas Civil Practice and Remedies Code, a non-resident defendant "does business" if it:

    a. Contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

    b. Commits a tort in whole or in part of this state.

TEX. CIV. PRAC. & REM. CODE §17.042

3.     Due process, the second prong for personal jurisdiction, is satisfied if: (1) the defendant has minimum contacts with the state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Moki Mac River Expeditions*, 221 S.W.2d at 575. The "minimum contacts" test looks to see whether or not the defendant <u>purposefully availed</u> himself of the privilege of conducting activities in Texas. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005).

4.     Courts utilize the following factors in determining whether or not a non-resident defendant has purposively availed himself to the State of Texas: (1) the acts must be the defendant's own actions; (2) the defendant's actions must be purposeful as opposed to random, isolated and fortuitous; and (3) the defendant must seek some benefit, advantage or profit by availing himself of the privilege of doing business in Texas. *Id.* at 785.

5.     "At its core, the purposeful availment analysis seeks to determine whether a non-resident's conduct and connection to a forum are such that it could reasonably anticipate being hauled into court here." *Moncrief Oil Intern Inc. v. OAO Gazprom*, 414 S.W.3d 142, 152 (Tex. 2013) (internal quotations omitted).

6.     Minimum contacts can give rise to either general or specific jurisdiction. Only relevant jurisdictional facts, as opposed to the ultimate merits of

the case, should be considered by the Court in determining the issue of jurisdiction. *See Moncrief Oil Intern,* 414 S.W.3d at 154. At the jurisdictional phase, the trial court is to review the defendant's business contacts with the State of Texas and the subjective intent of the defendants cannot negate their contacts. *Id.*

### i.    General Jurisdiction

7.    To establish general jurisdiction, the defendant's contacts must be continuous and systematic. For a corporation, general jurisdiction is typically established in either the state of incorporation and the corporation's principle place of business. *Daimler AG v. Bauman,* 134 S.Ct. 746, 758, n.11 (2014). For an individual, the exercise of general jurisdiction is usually limited to the individual's domicile. *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 924 (2011). However, courts have held that a corporation's operations in another state might be substantial enough to render the corporation "at home" in that state. *Bauman,* 134 S.Ct. at 761. Here, the City concedes that general jurisdiction does not exist because Emmons lives in Georgia and Source Capital's principle place of business is Georgia. Therefore, the City will only focus on specific jurisdiction which is applicable in this case.

### ii.    Specific Jurisdiction

8.    Specific jurisdiction is established if the defendant's liability arises out

of or is related to an activity conducted in the State of Texas. *Moki Mac River Expeditions*, 221 S.W.3d at 576. In order to be related to, there must be a substantial connection to the facts in the case. *Id.* at 585. "A substantial connection can result from even a single act." *Moncrief Oil Intern*, 414 S.W.3d at 151. For specific jurisdiction, courts look at the relationship "between the defendant, the forum and the litigation." *Glencoe Capital Partners II, LP v. Gernsbacher*, 269 S.W.3d 157, 154 (Tex.App.- Fort Worth 2008, no pet.). For specific jurisdiction, "it is not necessary that the nonresident defendant's conduct actually occur in Texas, as long as the defendant's acts were purposefully directed towards Texas…" *Hoskins v. Ricco Family Partners, Ltd.*, 2016 WL 2772164 at *5 (Tex.App.- Fort Worth May 12, 2016, no pet.) (internal quotations omitted).

9.     This Court is to analyze the contacts on a claim by claim basis unless all claims arise from the same contacts. *Moncrief Oil Intern*, 414 S.W.3d at 142. In this case, all of the claims arise from the same contacts, and therefore, the Court does not need to analyze the contacts on a claim by claim basis.

### iii.     Source Capital's Contacts with the state of Texas

10.     Appellants' Second Amended Petition asserts the following claims against Source Capital: fraud, negligent misrepresentation, breach of contract and promissory estoppel. These claims stem from representations and promises made by

Emmons and Source Capital both while present in Texas and directed towards a city in Texas. Therefore, Appellants sufficiently established their initial pleading burden. *See, e.g., Moncrief Oil Intern Inc.* 414 S.W.3d at 149.

11. In general, "the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex.1995). In addition, an LLC can only act through its agent and authorized representatives. *360-Irvine, LLC v. Tin Star Development, LLC*, 2015 WL 3958509 at *5 (Tex.App.- Dallas June 30, 2015, no pet.). Therefore, the "actions of an entities' agent are deemed the acts of the entity." *Id.*

12. A trial court may exercise jurisdiction if a nonresident business specifically seeks out a Texas business or Texas assets. *Cornerstone Healthcare Group Holding, Inc. v. Nautic Mgmt.*, 2016 WL 3382159 at *6 (Tex. June 17, 2016).

13. In *Cornerstone Healthcare*, the Texas Supreme Court held that an out-of-state private equity fund and its general partner who specifically targeted Texas assets to invest (and ultimately profit from) had purposefully availed themselves to jurisdiction in the State of Texas. *Id.* The Texas Supreme Court held that even though a subsidiary actually purchased the Texas hospitals, "[k]eeping legal entities distinct does not mean that they can escape jurisdiction by splitting an integrated transaction into little bits." *Id.* at 73. In finding that the private equity fund and general partner

could be subjected to jurisdiction in Texas, the Court took into consideration the following facts: (1) the private equity fund "spearheaded" the transaction and "ultimately stood to profit" from the transaction; and the fund specifically sought out a Texas seller and Texas assets. *Id.*

14. In *Moncrief Oil Intern*, the Texas Supreme Court held that a Russian company was subject to jurisdiction in Texas when the defendants attended two meetings in Texas regarding a potential joint venture in Texas. *Moncrief Oil Intern*, 414 S.W.3d at 156. The Court in *Moncrief Oil Intern* held that the defendants purposely availed themselves to jurisdiction in Texas when they attended two meetings in Texas and sought the benefits and protection of Texas law. *Id.* The Court noted that the United States Supreme Court "concluded that forming an enterprise in one state to send payments to a corporation in the forum state was sufficient to confer specific jurisdiction." *Id.* at 153.

15. In *Horizon Shipbuilding*, the Houston Court of Appeals held that an Alabama Corporation, by way of its project manager and president, was subject to jurisdiction when the two individuals attended a meeting in Texas to discuss aspects of an already executed contract amongst the parties. *Horizon Shipbuilding, Inc. v. Blynn II Holdings, LLC.*, 324 S.W.3d 840 (Tex.App.-Houston [14th Dist.] 2010, no pet.) The appellate court noted that the meeting "constituted a significant part of an

ongoing relationship among the parties" and "it was foreseeable that any disputes deriving from that meeting might be heard by a Texas court." *Horizon Shipbuilding*, 324 S.W.3d at 848-49.

16. Recently, the Fort Worth Court of Appeals upheld the denial of a special appearance when the non-resident defendants made fraudulent statements while physically present in the State of Texas which were the basis of the lawsuit. *Patel v. Pate,* 2017 WL 2871684 at *5 (Tex.App.- Fort Worth July 6, 2017, no pet.). The Appellate Court held that the Plaintiff sufficiently brought forward legally and factually sufficient evidence to establish that the representations were made while the non-resident defendant was located in Texas. *Id.* at *8.

17. In this case, Source Capital, through Benjamin Emmons and Matthew Smith, undertook and negotiated a Workout Agreement with Capital One Bank as well as Horizon and the Seven Cities (one of which was White Settlement). To memorialize these promises, Source Capital and Emmons sent Phil Bray, then Director of Finance at the City, a detailed letter which explained the various promises by Source Capital and Emmons.[61] Notably, this letter is on Source Capital's letterhead.

---

[61] Appendix Tab 2

18.   These representations, which are the foundation of the City's contract and fraud claims against both Emmons and Source Capital, were made by Emmons while attending a meeting in White Settlement.[62] The City provided the trial court a copy of the letter as well as the affidavits of Jim Ryan and Phillip Bray who both attested to the fact that these allegations were made by Emmons and Source Capital.[63] Emmons also admits that he made three trips to Texas which related to the water park in White Settlement.[64] Source Capital also admits that it made three payments to White Settlement relating to the water park in this case.[65]

19.   In addition to the payments made by Source Capital and the trips to White Settlement, both Emmons and Matthew Smith, on behalf of Source Capital, initiated and participated in numerous telephone and email communications with representatives from the City regarding the Workout Agreement and the various promises and representations that were substantially relied upon by the City.[66] These

---

[62] CR. 605.

[63] CR. 603-617.

[64] CR. 148.

[65] CR. 148.

[66] CR. 701-723.

contacts were purposeful and directly relate to the claims being brought by the City against both Emmons and Source Capital. Source Capital sought out White Settlement and the investment into Horizon.[67] These contacts are more than enough to establish that Source Capital has minimum contacts with the State of Texas to give rise to specific jurisdiction.

### iv. Benjamin S. Emmons' Contacts with the State of Texas

20. Due to the multiple meetings attended by Emmons and the numerous telephone calls, emails and letters directed to individuals in the State of Texas which directly relate to the claims in this case, Emmons purposefully availed himself to jurisdiction in the State of Texas. The claims asserted against Emmons are conversion, Texas Theft Liability Act, fraud, negligent misrepresentation, breach of contract and promissory estoppel. All of these claims either arise from representations and actions taken by Emmons while physically present in the State or directed towards individuals in the State of Texas. Emmons alleged that his visits to Texas did not amount to purposeful availment.[68] However, as stated in more detail below, Emmons' contacts with the State of Texas were purposeful and directly relate

---

[67] CR. 676-681.

[68] CR. 152.

to the facts surrounding the claims in this case.

21. Emmons alleges that the fiduciary shield doctrine protects him from jurisdiction.[69] Emmons is mistaken. The fiduciary shield does not protect a corporate officer from specific jurisdiction as to intentional torts or fraudulent acts for which Emmons could be held individually liable. *Stull v. LaPlant,* 411 S.W.3d 129, 135 (Tex.App.- Dallas 2013, no pet). "There is no blanket protection from jurisdiction simply because a defendant's alleged acts were done in a corporate capacity." *SITQ E.U., Inc. v. Reata Restaurants, Inc.,* 111 S.W.3d 638, 651d (Tex.App.- Fort Worth 2003, pet denied.) (internal quotations omitted).

22. In this case, the City alleges that Emmons committed a fraud while in Texas and that he instructed individuals in Texas to commit a tort. Therefore, the fiduciary shield doctrine is not applicable. *See Jani-King Franchising, Inc. v. Falco Franchising, S.A.,* 2016 WL 2609314 at *2 (Tex.App.- Dallas May 5, 2016, no pet.).

23. Emmons also alleges that the contract and promissory estoppel claims in this case are actually converted tort claims and therefore the fiduciary shield doctrine applies. As stated in more detail below, this argument should be disregarded by this Court.

---

[69] CR. 155.

24.    Emmons cites to one unpublished opinion to support his argument that the fiduciary shield does not apply if the claim is "nothing more than a contract dispute."[70] First, it is impermissible at this stage in the lawsuit to look to the merits of the claims. *Moncrief Oil Intern*, 414 S.W.3d at 156. Instead, the Court is to look at all jurisdictional facts to determine if Emmons has minimum contacts with the State of Texas. Second, the Texas Supreme Court has held that "it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself" and the Texas Supreme Court "has also repeatedly recognized that a fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract." *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998).

25.    In this case, Appellants allege that Source Capital and Emmons made representations to the City which were false or made recklessly.[71] These promises were later laid out in a letter from Emmons to the City. Ultimately, it will be up to the trier of fact to determine if the City has established either a fraud and/or breach

---

[70] CR. 156.

[71] CR. 303.

of contract claim. Emmons should not be able to circumvent jurisdiction in the State of Texas by impermissibly hiding behind the fiduciary shield when the City has adequately pled plausible facts to suggest that Emmons committed a fraud in the state of Texas.

26. In addition, the City is bringing a conversion and claim under the Texas Theft Liability Act for Emmons' role in selling equipment that was owned by the City. These claims are distinctly separate from the other claims in this case.

27. As the fiduciary shield does not apply in this case, Emmons has purposefully availed himself to jurisdiction in the State of Texas. In *Glencoe Capital Partners*, the Fort Worth Court of Appeals held that a shareholder and nonresident director had purposefully availed themselves of jurisdiction in Texas based on their participation in telephone meetings where representations were made which were the basis of the lawsuit. *Glencoe Partners II, LP v. Gernasbacher*, 269 S.W.3d 157, 167 (Tex.App.- Fort Worth 2008, no pet.). The Court concluded that these telephone calls were purposeful and that their liability, if any, arose from their contacts with the State of Texas. *Id.*

28. The Fort Worth Court of Appeals in *Carlile Bancshares* held that former non-resident directors had sufficient contacts with the state to give rise to jurisdiction. *Carlile Bancshares, Inc. v. Armstrong*, 2014 WL 3891658 at *13

(Tex.App.- Fort Worth Aug. 7, 2014, no pet.). The Court took into consideration that the directors sent emails to employees in Texas; traveled to Texas to meet with employees; and "were experienced businessmen and knew the information they provided would be relied upon" by the Plaintiff in making a decision in Texas. *Id.*

29.    In *Norstrud*, the Fort Worth Court of Appeals upheld the special appearance denial of the non-resident chief financial officer. *Norstrud v. Cicur*, 2015 WL 4878716 at \*11 (Tex.App.- Fort Worth Aug. 13, 2015, no pet.). The Court held that the fiduciary shield did not apply because it was alleged that the CFO purposefully targeted the plaintiff in Texas and directed the misinformation in order to secure the investment. *Id.* at. \*8. Despite not even traveling to the State of the Texas, the Court upheld the denial of the special appearance. *Id.* at \*9.

30.    In this case, Emmons traveled to Texas; initiated and participated in numerous phone calls into Texas and exchanged many emails with representatives from White Settlement.[72] It was during a meeting in White Settlement that he made the representations which are the basis of the fraud and contract claims in this case. He also directed individuals in Texas to sell the City's equipment.[73] These contacts

---

[72] CR. 605-606; CR. 612-615; CR. 701-723.

[73] CR. 946-958.

were purposeful, plentiful and directly relate to the City's claims in this case. Emmons has not provided any evidence to contradict the evidence provided by the City that Emmons made false representations while in White Settlement or that he caused certain equipment to be improperly sold. *See Fox Lake Animal Hospital PSP v. Wound Management Technologies, Inc.,* 2014 WL 1389751 at *5 (Tex.App.- Fort Worth April 10, 2014, pet.denied).

31. Emmons is an experienced businessman who knew that the representations would be relied upon by individuals in the State of Texas. *See Carlile Bancshares, Inc.,* 2014 WL 3891658 at *13. Therefore, the Court should find the Emmons has purposefully availed himself of jurisdiction in Texas.

### C. The exercise of jurisdiction comports with fair play and substantial justice

32. As both Emmons and Source Capital had minimum contacts with the State of Texas and purposefully availed themselves, the exercise of jurisdiction comports with fair play and substantial justice. Courts look to the following factors to determine if the exercise of jurisdiction comports with fair play and substantial justice: (1) the burden on the defendants; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states

in furthering fundamental, substantive social policies. *Glenco Capital Partners, II, LP.*, 269 S.W.3d at 168.

33. "If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Moncrief Oil Int'l Inc.*, 414 S.W.3d at 154-55. The burden is on Source Capital and Emmons to sufficiently "present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Guardian Royal Exchange Assurance, LTD. v. English China Clays. P.L.C. et al*, 815 S.W.2d 223, 231 (Tex.1994). Distance to the forum is also generally insufficient to defeat jurisdiction. *Glencoe Capital Partners, II, LP.*, 268 S.W.3d. at 168.

34. Source Capital and Emmons have not met their burden of providing a compelling reason as to why the exercise of jurisdiction would be unreasonable. Instead, Source Capital and Emmons claim it would be unreasonable because neither have sufficient ties with Texas and "Plaintiffs have potential recourse against Hawaiian Parks..."[74] Using this rationale, any nonresident defendant could avoid jurisdiction by claiming that the Plaintiff could recover from another party. Such an unreasonable result should not be permitted by the Court.

---

[74] CR. 161.

35.     Both Emmons and Source Capital knew based on their contacts within Texas that they could be brought into a Texas court room. This case also involves other parties and claims and thus it would be more efficient to resolve the entire case in the same place. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 155. Texas also has an interest in providing a forum for its residents to address grievances inflicted by non-resident parties. *See Glencoe Capital Partners, II, LP.*, 268 S.W.3d. at 168.

36.     Source Capital and Emmons have both failed to provide any reasonable justification for why jurisdiction should not be imposed in this case; therefore, the Court should find that the exercise of jurisdiction in this case comports with fair play and substantial justice.

## CONCLUSION & PRAYER

The facts in this case are not in dispute. Emmons and Source Capital made substantial, subordinate loans to Horizon, a business entity in Texas. Horizon had leases to operate seven water parks located in seven cities throughout Texas including, the City of White Settlement. When Horizon went into default with its senior lender (Capital One Bank) and its leases, Emmons and Source Capital sought to salvage their loan with the Workout Agreement. Emmons and Source Capital came to Texas to persuade the Seven Cities, including White Settlement, to

cooperate. Promises were made and reliance occurred. White Settlement agreed to forebear from putting its Lease into default. The promises made by Emmons and Source Capital were breached which caused damage to the City.

Both Source Capital and Emmons have more than enough purposeful contacts within Texas which directly relate to the claims in this case. As Source Capital and Emmons have purposefully availed themselves of jurisdiction, the Court should reverse the trial court's granting of the Special Appearance for both Emmons and Source Capital.

WHEREFORE, premises considered the City respectfully requests that the Justices of this Honorable Court reverse the trial court's granting of the Special Appearance for Emmons and Source Capital, remand the case back to the trial court and grant the City any and all other relief to which they may show themselves justly entitled, in law or equity.

Respectfully submitted,

MARIS & LANIER, P.C.

/s/ Robert F. Maris
Robert F. Maris
State Bar No. 12986300
rmaris@marislanier.com
Alise N. Abel
State Bar No. 24082596
aabel@marislanier.com
MARIS & LANIER, P.C.
3710 Rawlins Street, Suite 1550
Dallas, Texas 75219
214-706-0920 telephone
214-706-0921 facsimile

ATTORNEYS FOR APPELLANTS

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, that this brief complies with the length limitations of Rule 9.4(i) and the typeface requirements of Rule 9.4(e).

Exclusive of the contents excluded by Rule 9.4(i)(1), this brief contains 5,462 words as counted by the Word Count function (including textboxes, footnotes, and endnotes) of Microsoft Word 2013.

This brief has been prepared in proportionally spaced typeface using:

Software:   Microsoft Word 2013
Typeface:   Times New Roman
Font Size:   14 point

/s/Robert F. Maris
Robert F. Maris


## CERTIFICATE OF SERVICE

I hereby certify that a true, correct and complete copy of the foregoing document was served in accordance with Rule 9.5 of the Texas Rules of Appellate Procedure on the 20th day of December, 2017 to:

C. Michael Moore
Matthew T. Nickel
Spencer Hamilton
DENTONS US LLP
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201
**VIA E-FILE**

/s/Robert F. Maris
Robert F. Maris

NO. 02-17-00358-CV

# In the Court of Appeals
## Second District of Texas
## Fort Worth, Texas

## City of White Settlement, Texas, and White Settlement Economic Development Corporation

### Appellants,

### v.

## Benjamin S. Emmons, and Source Capital, LLC,

### Appellees.

*On Appeal from the 48th Judicial District Court of Tarrant County, Texas Cause No.048-288516-16; the Honorable David L. Evans Presiding*

## APPELLANTS' APPENDIX

| *Contents* | *Page* |
| --- | --- |
| Plaintiffs' Second Amended Petition | Tab 1 |
| Workout Agreement | Tab 2 |
| Phillip Bray Affidavit | Tab 3 |
| Jim Ryan Affidavit | Tab 4 |
| Order | Tab 5 |

**APPENDIX TAB "1"**

FILED
TARRANT COUNTY
5/5/2017 4:23:05 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 048-288516-16

| | | |
|---|---|---|
| CITY OF WHITE SETTLEMENT, TEXAS and the WHITE SETTLEMENT ECONOMIC DEVELOPMENT CORPORATION, | § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | |
| HAWAIIAN PARKS- WHITE SETTLEMENT, LLC, a Missouri limited liability company, BENJAMIN S. EMMONS, SOURCE CAPITAL LLC, a Georgia limited liability company and CLINTON HILL, | § § § § § § § § § | 48th JUDICIAL DISTRICT |
| Defendants. | § § | TARRANT COUNTY, TEXAS |

## PLAINTIFFS' SECOND AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiff City of White Settlement, Texas ("the City") and the White Settlement Economic Development Corporation ("EDC") (collectively "Plaintiffs" and/or "White Settlement") and complain of Defendants Hawaiian Parks-White Settlement, LLC ("HParks"), Benjamin S. Emmons ("Emmons"), Source Capital, LLC ("Source Capital") and Clinton Hill ("Hill) (collectively "Defendants"). In support thereof, Plaintiffs respectfully show the following:

286

## I.

### Discovery Control Plan

1. Plaintiffs plead that discovery in this case should be governed by the Level 3 Discovery Control Plan, as set out at Rule 190.4 of the Texas Rules of Civil Procedure.

## II.

### Parties

2. The City of White Settlement is a governmental entity organized as a Texas home rule municipality.

3. White Settlement Economic Development Corporation is a Texas non-profit corporation and is a Type B corporation created and operating under The Development Corporation Act, V.T.C.A., Local Government Code, Title 12, Subtitle C1, as amended, specifically Chapters 501 and 502 thereof.

4. Hawaiian Parks-White Settlement, LLC is a limited liability company organized under the laws of the state of Missouri. HParks is a nonresident doing business in Texas pursuant to Section 17.042 of the Civil Practice and Remedies Code. HParks no longer maintains a place of regular business in this State nor a designated agent upon whom service may be made. At all times relevant to the matters pled herein, HParks maintained its regular place of business in Texas. In addition, HParks' last business activity took place in Texas. HParks has already been served with process.

5. Benjamin S. Emmons is a nonresident individual doing business in Texas pursuant to Section 17.042 of the Civil Practice and Remedies Code and he has already been served with process.

6. Source Capital, LLC is a Georgia limited liability company whose principal place of business is 75 14th Street, Suite 2700, Atlanta, Georgia 30309. Source Capital is

287

a nonresident doing business in Texas pursuant to Section 17.042 of the Civil Practice and Remedies Code who has already been served with process.

7. Clinton Hill is an individual residing in Texas who has already been served with process.

## III.

## Venue and Jurisdiction

8. Venue is proper in Tarrant County, Texas, pursuant to Section 15.002(a)(1) inasmuch: a) all or a substantial part of the events or omissions giving rise to the claims occurred in Tarrant County, Texas; and b) the contract upon which the suit is based was performed, in whole, in Tarrant County, Texas. This Court has personal jurisdiction over Defendants as they have purposefully availed themselves to the jurisdiction of this Court by making contacts with this forum that are sufficient to give rise to general or specific jurisdiction and the exercise of jurisdiction will not offend the traditional notices of fair play and substantial justice.

9. Specifically, Emmons has personally availed himself to the jurisdiction of this Court based on the numerous communications and visits made by Emmons in the State of Texas. In addition, Plaintiffs allege Emmons committed a fraud and/or negligent misrepresentation when he caused Plaintiffs to enter into an agreement, in Texas, based on false pretenses.

10. This Court also has jurisdiction over Source Capital based on the numerous communications and visits within Texas made by Source Capital representatives including Ben Emmons and Matt Smith. Plaintiffs also allege that Source Capital committed a fraud and/or negligent misrepresentation when it caused Plaintiffs to enter into an agreement, in Texas, based on false pretenses.

288

## IV.

## Statement of Relevant Facts

11.    Source Capital is a private equity firm which makes both control equity investments and mezzanine debt investments in mature, lower-middle market U.S. companies across a range of industries. Source Capital Mezzanine Fund I, LP is a Delaware limited partnership that is a pooled investment fund; Source Horizon Mezzanine Co-Investment Fund I, LP is a Delaware limited partnership that is a pooled investment fund; and Gregson Trust is a family owned trust, all collectively referred to as the "Source Capital Lenders". In 2013, Source Capital caused the Source Capital Lenders to make a debt investment (a loan) in Horizon Family Holdings, LLC. Horizon Family Holdings, LLC ("Horizon") is a Missouri based holding company with offices in and doing business in, the State of Texas. The loan was to be repaid from the operations of Horizon's waterparks in Texas (the "Seven Water Parks"). The purpose of the loan was for essential working capital and construction monies for certain of the Seven Water Parks. Appropriate loan documents were executed by Horizon. See Paragraph 18 below for further discussion. In 2013, Horizon began construction of the Pflugerville and White Settlement parks and thereafter, operated water and adventure park companies in the state of Texas, including companies whose parks are located in Garland, Pflugerville, Mansfield, Roanoke, The Colony, Waco and White Settlement ("the Seven Water Parks"). Horizon no longer operates the parks in White Settlement or Pflugerville. The waterpark lease at White Settlement was owned by Horizon's affiliate, HParks.

12.    Emmons has represented that Source Capital or its affiliate, Source Horizon, LLC, is the controlling owner of Horizon.

289

13. Horizon operated the Seven Water Parks on a consolidated basis, including the financing, accounting, key management, human resources, marketing and administration activities of the Seven Water Parks. Particularly, Horizon controlled the funds of itself and all of its Seven Water Park affiliates.

14. Beginning in 2013, White Settlement and Mr. David Busch initiated discussions for the development, construction and operation of a water and adventure park (the "Park") to be built in White Settlement by HParks. Mr. Busch had an extensive history in developing and operating water parks. The proposal was attractive to White Settlement as it presented a means of generating new economic development sorely needed in the City.

15. On September 26, 2013, the City and HParks entered into a Construction Agreement ("Construction Agreement") in which the City agreed to provide up to $12,500,000.00 to fund the construction and equipping of the Park on the City's property. In return, HParks was responsible for designing, developing, constructing and equipping the Park. Construction was set to begin no later than November 1, 2013 and was to be completed by May 24, 2014.

16. The $12,500,000.00 funding for the construction to HParks was provided by White Settlement.

17. Simultaneous with the Construction Agreement, White Settlement, and HParks entered into a Water and Adventure Park Ground Lease and Operating Agreement ("Lease and Operating Agreement") on September 26, 2013.[1] The Lease and Operating Agreement provided that HParks would operate and maintain the Park,

---

[1] A true, correct and complete copy of the Lease and Operating Agreement is attached hereto as Exhibit "1" and incorporated herein by reference.

as well as pay semi-annual lease payments initially in amounts sufficient enough to reimburse the debt servicing cost for the construction and equipping of the Park, and thereafter annual lease payments of five (5) percent of Gross Revenues.[2] HParks was also liable for any operating cost shortfalls. The term of the Lease and Operating Agreement was forty (40) years and provided for renewals thereafter. The first lease payment was to be paid the thirtieth (30th) day after the certificate of occupancy was issued to HParks. All lease payments were to be made by HParks at the City of White Settlement Finance Department, 214 Meadow Park Drive, White Settlement, Texas 76108.[3]

18. During 2013, Horizon needed additional money to finish construction of the waterparks at White Settlement and Pflugerville and for additional operating capital. As such, Horizon sought to borrow 3.5 million dollars from Source Capital. Source Capital orchestrated the loan from the Source Capital Lenders. To collateralize this loan, the Source Capital Lenders obtained liens on the assets of Horizon. Prior to this, Horizon had borrowed money from Capital One Bank in Fort Worth. The 3.5 million dollar Source Capital Lender's loan was subordinate to the Capital One loan. Appropriate documents to reflect the subordination agreement were executed by Capital One and the Source Capital Lenders.

19. The opening of the White Settlement park (the "Park") was set to occur on or about May 24, 2014. However, due to delays in construction, the Park did not open for operation until June 6, 2014. After construction was completed, the Park contained numerous pools and water slides together with food concessions and a conference

---

[2] Exhibit "1" at Paragraph 8.
[3] Exhibit "1" at Paragraph 8.4

center. The adventure park with rope courses and climbing walls was not completed at the time of opening. The Park was to be open year-around with the water portion of the Park available only during the summer.

20. Pursuant to the Lease and Operating Agreement, HParks was required to make the first lease payment on October 1, 2014 in the amount of $500,000.00. The second payment of $200,000.00 was due on April 1, 2015. HParks did not make these lease payments fully or timely. HParks did so only after White Settlement signed certain Consents sought by Emmons and Source Capital as further discussed in Paragraph 30 below.

21. The Lease and Operating Agreement also required HParks to make a lease payment in the amount of $600,000.00 to White Settlement on or before October 1, 2015. HParks failed to make this lease payment. HParks was obligated to pay interest on any late lease payments. HParks failed to pay the interest as required.

22. By late 2014, HParks went into default on White Settlement's Lease and Operating Agreement and Horizon went into default on the loan or loans with Capital One Bank and the loans with the Source Capital Lenders. As a result of the defaults, numerous cities, including White Settlement, threated to terminate their lease and Capital One Bank threatened to foreclose on the assets of Horizon. If the leases were terminated and Capital One foreclosed on its liens, the Source Capital Lenders would not be able to obtain repayment of their 3.5 million dollar loan.

23. Ben Emmons was and is a partner and a Managing Director of Source Capital. Mr. Emmons was and is an investor and limited partner in one or more of the Source Capital Lenders and a managing member of the general partner entities of certain of the Source Capital Lenders. As such, Mr. Emmons has a personal financial

interest in Source Capital and the Source Capital Lenders. Source Capital and Source Capital Lenders each have published statements about Mr. Emmon's roles in their organizations. Source Capital had only one Texas business in its portfolio; that being Horizon.

24. Emmons was directly involved in the negotiation of the 3.5 million dollar loan from the Source Capital Lenders to Horizon. Emmons was also directly involved in servicing this loan. As part of these activities, Emmons physically visited all the waterparks in Texas; he regularly communicated with the management of Horizon including David Bush and Clinton Hill in Texas; he regularly communicated with a Capital One representative, David Denbin, who was located in Fort Worth, Texas and he communicated with the City of White Settlement as well as with the other cities where the waterparks were located. Emmons also had meetings in Texas with representatives of Horizon and Capital One. At all times relevant to this lawsuit, White Settlement believed that Ben Emmons represented Source Capital and/or himself.

25. Other Source Capital personnel were involved in the Horizon loans. Particularly, Matthew Smith was actively involved in key matters regarding Horizon. Mr. Smith is a team member and vice president of Source Capital. Mr. Smith frequently communicated with Horizon, Capital One, and the Seven Water Parks by telephone and email communications. Mr. Smith also made numerous visits to Texas.

26. In early 2015, Ben Emmons, representing Source Capital and the Source Capital Lenders, undertook and negotiated a workout agreement with Capital One Bank as well as the cities who owned the Seven Water Parks (the "Workout Agreement"). The Workout Agreement is reflected in the press release attached hereto as Exhibit "2". According to the press release, the principal features of the Workout

293

Agreement including the following:

    a. "Capital One Bank would enter into a forbearance agreement whereby the Bank would refrain from foreclosing before the end of 2015;

    b. Source Capital would advance an additional 5 million dollars to pay past due rents due on the waterpark leases and to operate the Seven Water Parks through the end of 2015;

    c. Source Capital would refinance the debt of Horizon by the end of 2015 or sell the parks and pay off the debts of Horizon."

27. The negotiation process stretched over a six month period from late 2014 through May 2015. During this period of time, Emmons had numerous telephone conversations with representatives of Capital One Bank, Horizon, and representatives of the Seven Water Parks. All of the persons communicating with Emmons were in the State of Texas. Emmons also made numerous physical visits to Texas to meet with representatives of Capital One Bank, Horizon as well as with officials at the City of White Settlement in connection with the Workout Agreement.

28. In order to complete the Workout Agreement, it was necessary for the cities of the Seven Water Parks to consent to the changes in the debt structure of Horizon as well as the ownership of the parks. It was also necessary that the Seven Water Parks defer their ability to exercise the rights and remedies under their ground leases even though the ground leases were in default.

29. Ben Emmons met with White Settlement officials in early 2015 to discuss the Park's operations and finances as well as the Workout Agreement. The meeting occurred in White Settlement, Texas. At the meeting, Emmons asked White Settlement to consider approving certain matters regarding the Lease and Operating Agreement

and the financing of the Park's operations. Particularly, Emmons sought the approval by White Settlement of a Consent to Mortgage of Leasehold of the Park (the "Mortgage Consent") to secure the continuation of a previous loan up to $10,200,000.00 from Capital One (the "Lender") to Horizon. Emmons specifically represented that the Consent would benefit White Settlement. Emmons stated that the Mortgage Consent from White Settlement was especially important to Capital One. Particularly, Capital One conditioned its agreement to the extended lending transaction on receipt of White Settlement's signed Consent to Mortgage.

30. In addition to requesting White Settlement agree to the Mortgage Consent, Emmons requested White Settlement agree to a Consent to a future Change of Ownership (the "Ownership Consent") for the transfer of ownership of Horizon to Source Horizon, LLC, a Georgia limited liability company affiliated with Source Capital. In connection with this transfer of ownership, Emmons represented Source Capital would inject up to $5,000,000 in Horizon for the benefit of HParks and other of the Seven Water Parks. Mr. Emmons further represented that this cash injection, together with an additional cash injection of $1,000,000 by Source Capital and Capital One Bank, would ensure that Horizon would have enough cash to resolve all of the 2014 hold-over obligations, handle the 2015 commitments as they became due (including the $600,000 rent payment due to White Settlement in October, 2015), and carry enough reserves into the off-season for operating expenses. Emmons also represented that Mr. Busch would remain the CEO.

31. Because HParks had failed to timely and fully pay the first and second lease payments, White Settlement was very concerned about the ability of HParks to pay the remaining balances of 2014 and 2015 lease payments already delinquent and to

295

timely pay subsequent lease payments timely, particularly the one due on October 1, 2015. White Settlement had no reason to agree to the Mortgage Consent unless White Settlement would benefit from the continuation of Capital One's loan and White Settlement would be paid the lease payments. Additionally, because HParks had failed to resolve its 2014 hold-over obligations, White Settlement was very concerned about HParks' financial health and ability for 2015 and the following years. White Settlement had no reason to agree to the Ownership Consent unless the cash infusions were made by Source Capital and Capital One in connection with the change of ownership sought by Source Capital and such infusions were used to benefit White Settlement. At the meeting in White Settlement and in conversations and writings thereafter, Emmons represented that if the Mortgage Consent was given by White Settlement, the outstanding and the future October 1, 2015 lease payments to White Settlement would be paid.[4] This representation was material. White Settlement relied on the representation. But for this representation, White Settlement would not have executed the Mortgage Consent requested by Emmons and would have pursued its rights and remedies for the defaults under the Lease. Based on information and belief, Emmons knew this representation was false or made it without any knowledge of its truth. Again, Mr. Emmons promised White Settlement that lease payments would be made timely if the Mortgage Consent was signed by White Settlement. This representation was material. White Settlement relied on the representation. Similarly, but for the cash injection representations, the operating representations and key management representations made by Mr. Emmons in connection with the request for the Ownership Consent, White Settlement would not have executed the Ownership

[4] A copy of the letter sent by Ben Emmons is attached hereto as Exhibit "3".

Consent, and would have pursued its rights and remedies for the default under the Lease.

32. Emmons' representations proved to be untrue. Emmons, and Source Capital, determined that the Park at White Settlement was not financially viable. As a result of this conclusion, Emmons and Source Capital engaged in activities which reduced the financial commitment to the Park. These activities included:

    a. Only 3.7 million of the 5 million dollars promised was advanced for the debt service and operation of the Seven Water Parks, including White Settlement;

    b. All the Seven Water Parks' rent payments through 2015 were paid except for White Settlement. Their promises to the contrary, the $600,000.00 rental payment due to White Settlement in October 2015 purposefully was not paid;

    c. $300,000.00 in operating income generated at White Settlement was diverted to the support of the other Seven Water Parks;

    d. No efforts was made to maintain the White Settlement waterpark;

    e. Efforts to pay outstanding vendor indebtedness were delayed or halted, resulting in mechanic's liens;

    f. Adequate insurance was not maintained on the Park; and

    g. Mr. Busch was not retained as the CEO.

33. Following HParks' failure to make a lease payment, White Settlement notified HParks of its default under the Lease on February 18, 2016. HParks was given sixty (60 days) to remedy the default. HParks failed to remedy the default and White Settlement subsequently terminated the Lease and Operating Agreement.

34. After Source Horizon acquired Horizon, Emmons, Matthew Smith and Clinton Hill served on the board of Source Horizon. Source Horizon exercised significant control over the operations of Horizon, the control being greater than that normally exercised by a parent entity over a subsidiary entity.

35. Prior to the termination of the Lease and Operating Agreement, Emmons and Clinton Hill ("Hill") caused the arcade games and other equipment owned by White Settlement from the Park (collectively, the "Equipment") to be removed from the Park. This activity by Emmons and Hill was done without approval or permission of the City despite the fact the City owned the Equipment. The Equipment was valued at over $276,000.00. The Lease and Operating Agreement clearly state that at the termination of the Lease and Operating Agreement, the City shall retain title to all personal property which includes all goods, Operating Inventory, merchandise, computers, software, vehicles, and machinery owned in connection with the Park.[5]

36. Multiple mechanics liens were filed against the Park in direct violation of the Lease and Operating Agreement as a result of Horizon's non-payment to the vendors. The claimed indebtedness for these liens exceeded $900,000.00. Horizon did not timely resolve several of these liens. At least one lawsuit regarding one of the liens was filed in Tarrant County, Texas. The City had to resolve this lawsuit at a cost of $27,605.37. Emmons represented the mechanics liens would be resolved and requested all such claims be reported to Source Capital. The City complied with this request. However, to date, certain of these encumbrances filed against HParks and White Settlement's Park property are not released.

37. Horizon also failed to maintain adequate insurance as required under the

[5] Exhibit "1" at Paragraph 6.6.3

Lease and Operating Agreement. Particularly, full replacement cost value property insurance was required by the Lease. In 2016, White Settlement discovered that neither HParks or Horizon or Source Capital purchased property insurance for all of the water parks (not only HParks, but also for the other six parks operated by Horizon and its subsidiaries.) This insurance stated the value of White Settlement's property to be only $4,784,400.00. This stated value was substantially less than the full replacement cost value required by the Lease and Operating Agreement. As a result, White Settlement, at its expense, secured the necessary property insurance. The cost of the property insurance was $4,382.50.

38. In addition, Horizon failed to maintain the Park as required by the Lease and Operating Agreement and allowed waste to be committed on the Park which was prohibited under the Lease and Operating Agreement. Horizon also failed to repair or replace certain latent defects in the Park's improvements. The repair or replacement was required by the Lease and Operating Agreement. Among other latent defects, the platforms for the Adventure Park facility were inadequate and the roofs and/or structures leaked. In 2015, Emmons represented all needed maintenance and repairs would be made. The representations were material. The City relied on these representations. This representation proved to be false. After the termination of the Lease and Operating Agreement, White Settlement discovered the Park premises, fixtures and equipment were in disrepair and not in the good condition as required by the Lease and Operating Agreement. In order to open the Park in 2016, White Settlement made extensive repairs and necessary maintenance at a cost in excess of $290,672.00.

V.

a. First Cause of Action: Breach of Contract (HParks)

39. White Settlement sues HParks for breach of contract as follows:

40. White Settlement and HParks had a valid and enforceable Lease and Operating Agreement whereby HParks agreed to operate and manage the Park. White Settlement has performed all of its obligations under the Lease and Operating Agreement. HParks breached the Lease and Operating Agreement for the following reasons:

a. Failure to timely make lease payments and interest thereon;
b. Failure to return White Settlement's personal property following the termination of the Lease and Operating Agreement;
c. Failure to report and resolve any mechanic liens;
d. Failure to maintain required insurance;
e. Failure to maintain and repair the Park; failure to repair or replace improvements with latent defects; and allowing waste of the Premises to occur; and
f. Failure to operate the Park per the Lease and Operating Agreement.

41. As a result of HParks' breaches, White Settlement has been damaged. White Settlement hereby sues HParks to recover its actual damages plus pre- and post-judgment interest at the maximum legal rate permitted by law, attorneys' fees, and costs of court. In addition, should it become necessary to impose equitable remedies to collect its damages, such as the imposition of a constructive trust or injunction, White Settlement requests that this Court grant all such relief to which White Settlement shows itself justly entitled.

b. Second Cause of Action: Promissory Estoppel (HParks)

42. Pleading further, and in the alternative, White Settlement sues HParks for promissory estoppel as follows:

43. At the request of HParks and in reliance upon the promise of payment by

300

HParks, White Settlement provided a substantial amount of funding to HParks. HParks accepted the $12,500,000.00 and had reasonable notice that White Settlement expected payment in return. In the event that it is determined that the agreement between White Settlement and HParks did not constitute an enforceable contract, White Settlement asserts that HParks should be estopped from denying the existence of an enforceable agreement because, by its words and deeds, HParks promised to pay White Settlement and White Settlement reasonably and substantially relied on HParks' promise to its detriment, that such reliance was foreseeable to HParks such that White Settlement will suffer a loss and HParks will be unjustly enriched in a like amount, should the promise not be enforced. White Settlement hereby sues HParks for its actual damages plus pre-and post-judgment interest at the maximum legal rate permitted by law, attorneys' fees and costs of court. In addition, should it become necessary to impose equitable remedies to collect its damages, such as the imposition of a constructive trust or injunction, White Settlement requests that this Court grant all such relief to which White Settlement shows itself justly entitled.

  c. <u>Third Cause of Action: Conversion (Emmons and Hill)</u>

44. The City sues Emmons and Hill for conversion as follows:

45. Emmons and Hill unlawfully, and without authorization, assumed dominion and control over property, including:

  a. Arcade games owned by the City; and

  b. Other equipment, including by not limited to, computer equipment and TVs, lockers, picnic tables, chairs, shade sails and power equipment and tools, owned by the City.

46. Emmons and Hill assumed dominion over this property to the exclusion of

the City's rights in the property.

47. The City sues Emmons and Hill for the value of its property at the time and place of Emmon's and Hill's conversion. The City is entitled to interest on the amount at the prejudgment rate of interest.

48. In addition, Emmons and Hill maliciously converted property that belonged to the City because they specifically intended to cause substantial injury to the City. Accordingly, the City seeks exemplary damages against Emmons and Hill for conversion.

d. Fourth Cause of Action: Texas Theft Liability Act (Emmons and Hill)

49. The City sues Emmons and Hill pursuant to the Texas Theft Liability Act as follows:

50. The City had a possessory right to the property described in paragraph 35.

51. Emmons and Hill unlawfully appropriated this property with the intent to deprive the City of the property.

52. As a result of Emmons and Hill's theft, the City has sustained damages and sues Emmons and Hill for its actual damages and $1,000.00 in statutory damages under Tex.Civ.Prac. & Rem. Code §134.005(a)(1). In addition, the City is entitled to attorney's fees pursuant to Tex.Civ.Prac.& Rem. Code §134.005(b).

e. Fifth Cause of Action: Fraud (Emmons and Source Capital)

53. Emmons and Source Capital made a representation to White Settlement that if White Settlement agreed to the Workout Agreement, the outstanding and the future lease payments, and particularly the lease payment of $600,000.00 which was due on October 1, 2015, would be made to White Settlement.

54. Emmons and Source Capital represented to White Settlement that if White

302

Settlement agreed to the Workout Agreement, Source Capital would inject up to $5,000,000 in Horizon Family Holdings, LLC and/or HParks.

55. Mr. Emmons and Source Capital further represented that this cash injection, together with an additional cash injection of $1,000,000 by Source Capital and Capital One Bank, would ensure that Horizon would have enough cash to resolve all of the 2014 hold over obligations, handle the 2015 commitments as they became due, and carry enough reserves into the off-season for operating expenses. Emmons also represented that Mr. Busch would remain the CEO.

56. Emmons and Source Capital also represented that all needed maintenance and repairs would be made at the Park.

57. Emmons and Source Capital represented that the mechanics liens would be resolved.

58. Emmons and Source Capital either knew each of the representations was false or made the representations recklessly without knowledge of its truth. Emmons, and Source Capital intended for White Settlement to rely on these representations and White Settlement did rely on these representations.

59. Due to Emmons' and Source Capital's blatant fraud, White Settlement was injured. White Settlement seeks recovery of its actual damages, exemplary damages, interest and court costs from Emmons and Source Capital.

     f.    Sixth Cause of Action: Negligent Misrepresentation

(Emmons and Source Capital)

60. Pleading further and in the alternative, White Settlement sues Emmons and Source Capital for negligent misrepresentation.

61. Emmons and Source Capital made a representation to White Settlement

that if White Settlement agreed to the Workout Agreement, the outstanding and the future lease payments, and particularly the lease payment of $600,000.00 which was due on October 1, 2015, would be made to White Settlement.

62. Emmons and Source Capital represented to White Settlement that if White Settlement agreed to the Workout Agreement, Source Capital would inject up to $5,000,000 in Horizon Family Holdings, LLC and/or HParks.

63. Emmons and Source Capital further represented that this cash injection, together with an additional cash injection of $1,000,000 by Source Capital and Capital One Bank, would ensure that Horizon Family Holdings, LLC would have enough cash to resolve all of the 2014 hold over obligations, handle the 2015 commitments as they became due, and carry enough reserves into the offseason. Emmons also represented that Mr. Busch would remain the CEO.

64. Emmons and Source Capital also represented that all needed maintenance and repairs would be made at the Park.

65. Emmons and Source Capital represented that the mechanics liens would be resolved.

66. These representations given to White Settlement were false and Emmons and Source Capital did not exercise reasonable care in communicating the representations.

67. White Settlement relied on these representations and only entered into the Workout Agreement following the representations by Emmons and Source Capital.

68. Emmons and Source Capital's representations caused White Settlement injury. White Settlement seeks to recover its actual damages, exemplary damages, interest and court costs from Emmons and Source Capital.

g.  Seventh Cause of Action: Breach of Contract (Emmons and Source Capital)

69.  Pleading further and in the alternative, White Settlement sues Emmons and Source Capital for breach of contract.

70.  As stated above, Emmons and Source Capital made certain promises to White Settlement which are contained in the Workout Agreement. Emmons and Source Capital may contend that they believed, in good faith, that the terms of the Workout Agreement would be performed.

71.  Emmons and Source Capital failed to perform as promised. This failure to perform constitutes a breach of contract which has caused damage to White Settlement. Therefore, White Settlement sues Emmons and Source Capital to recover its actual damages caused by the breach.

h.  Eighth Cause of Action: Promissory Estoppel (Emmons and Source Capital)

72.  Pleading further and in the alternative, White Settlement sues Emmons and Source Capital on a promissory estoppel theory.

73.  Emmons and Source Capital made promises to White Settlement.

74.  White Settlement reasonably relied on these promises to its detriment.

75.  White Settlement's reliance was foreseeable by Emmons and Source Capital.

76.  A material injustice will befall White Settlement unless the terms of the Workout Agreement are enforced through a judgment of this case. Therefore, White Settlement sues Emmons and Source Capital to recover its actual damages.

77.  Punitive Damages. Per Civil Practices and Remedies Code Section 41 with regard to the fraud and conversion claims.

78.  Attorney's Fees. Pursuant to Civil Practices and Remedies Code Section

305

38.

## Prayer

WHEREFORE, premises considered, White Settlement respectfully requests that a judgment be entered against Defendants and in favor of White Settlement requiring Defendants to pay to White Settlement the actual damages, exemplary damages, pre- and post judgment interest, attorneys' fees and costs of court as well as any and all other relief to which White Settlement may show itself justly entitled.

Respectfully submitted,

MARIS & LANIER, P.C.

/s/Robert F. Maris
Robert F. Maris
rmaris@marislanier.com
State Bar No. 12986300
Alise N. Abel
aabel@marislanier.com
State Bar No. 24082596
3710 Rawlins Street, Suite 1550
Dallas, Texas 75219
214-706-0920 telephone
214-706-0921 facsimile

ATTORNEYS FOR PLAINTIFF CITY
OF WHITE SETTLEMENT, TEXAS
AND THE WHITE SETTLEMENT
ECONOMIC DEVELOPMENT
CORPORATION

## CERTIFICATE OF SERVICE

This is to certify that a true, correct and complete copy of the foregoing instrument has been served in accordance with Rule 21a of the Texas Rules of Civil Procedure on the 5th day of May, 2017 to:

C. Michael Moore
Matthew T. Nickel
Blake J. Brownshadel
DENTONS US LLP
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201
**E-Filing**


Clinton Hill
2912 Appalachian Lane
Frisco, Texas 75033
**VIA CMRR#7008 1830 0001 6456 3169**

/s/ Robert F. Maris
Robert F. Maris

307

# EXHIBIT "1"

308

# WATER AND ADVENTURE PARK GROUND LEASE AND OPERATING AGREEMENT

This Agreement is made and entered into this the 26th day of September, 2013, by and between the City of White Settlement, Texas, the White Settlement Economic Development Corporation (hereinafter defined as "EDC"), and Hawaiian Parks - White Settlement, LLC, (hereinafter defined as "HPARKS").

## WITNESSETH:

The parties hereto agree as follows:

1. **GRANT, DEFINITIONS, AND WARRANTIES:**

   1.1 <u>Definition of Terms</u>:

   1.1.1 <u>Affiliate</u>: HPARKS or any person or entity controlling HPARKS, or any person or entity other than HPARKS in which HPARKS, or any person or entity controlling HPARKS, individually or collectively with HPARKS, owns or has the right to vote at least a fifty percent (50%) capital or voting interest of the common stock, partnership units or limited liability company interests, as applicable.

   1.1.2 <u>Agreement</u>: This Water and Adventure Park Ground Lease and Operating Agreement.

   1.1.3 <u>Debt Obligations</u>: The Debt Obligations issued by the CITY or the EDC to finance the CITY's Original Investment. City or EDC will present Debt Obligation terms to HPARKS for review and discussion prior to issuance.

   1.1.4 <u>Capital Improvement</u>: Subsequent to the completion of the Water and Adventure Park, any new construction, improvement or addition (as opposed to Maintenance and Repairs to, or the Structural Replacement of, existing Water and Adventure Park Improvements) costing more than $5,000 in any one instance and having a projected useful life of at least five years.

   1.1.5 City and EDC:
   a. <u>CITY</u>: The City of White Settlement, Texas, a Texas home-rule municipality.
   b. <u>EDC</u>: The White Settlement Economic Development Corporation, a Texas non-profit corporation created and operating pursuant to V.T.C.A., Local Government Code, Title 12, Subtitle C1, as amended, specifically Chapters 501, 502 and thereof.

   1.1.6 <u>Original Investment</u>: The original investment by the CITY and/or EDC for construction costs of the Water and Adventure Park Improvements and costs of issuance of the Debt Obligations, in the amount not to exceed $12,650,000.

1.1.7 <u>Construction Agreement</u>: The Agreement between the CITY and HPARKS for the construction of the Water and Adventure Park Improvements, executed concurrently with this Agreement.

1.1.8 <u>Effective Date</u>: The date the CITY issues a temporary or final certificate of occupancy to HPARKS for the Water and Adventure Park provided HPARKS is in compliance with the provisions of the Construction Agreement.

1.1.9 <u>Environmental Regulation</u>: any law, statute, regulation, order or rule now or hereafter promulgated by any Governmental Authority, whether local, state or federal, relating to air pollution, water pollution, noise control and/or transporting, storing, handling, discharge, disposal or recovery of on-site or off-site hazardous substances or materials, as same may be amended from time to time, including without limitation the following: (i) the Clean Air Act (42 U.S.C. § 7401 et seq.); (ii) Marine Protection, Research and Sanctuaries Act (33 U.S.C. § 1401-1445); (iii) the Clean Water Act (33 U.S.C. § 1251 et seq.); (iv) Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendments of 1984 (42 U.S.C. § 6901 et seq.); (v) Comprehensive Environmental Response Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. § 9601 et seq.); (vi) Toxic Substances Control Act (15 U.S.C. § 2601 et seq.); (vii) the Federal Insecticide, Fungicide and Rodenticide Act as amended (7 U.S.C § 135 et seq.); (viii) the Safe Drinking Water Act (42 U.S.C. § 300 (f) et seq.); (ix) Occupational Health and Safety Act (29 U.S.C. § 651 et seq.); (x) the Hazardous Liquid Pipeline Safety Act (49 U.S.C. § 2001 et seq.); (xi) the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.); (xii) the Noise Control Act of 1972 (42 U.S.C § 4901 et seq.); (xiii) Emergency Planning and Community Right to Know Act (42 U.S.C §§ 11001-11050); and (xiv) the National Environmental Policy Act (42 U.S.C §§ 4321-4347).

1.1.10 <u>Force Majeure Event</u>: Declared or undeclared war, sabotage, revolutions, riot or acts of terrorism or civil disobedience; acts or omissions of governmental agencies; accidents, fires or explosions; floods, earthquakes or other acts of God; strikes or labor disputes; shortages of materials; or any other event not within the control of HPARKS, the CITY, or the EDC and not caused by the negligent act or omission or intentional wrongful conduct of HPARKS, the CITY, or the EDC.

1.1.11 <u>Gross Revenues</u>: All monies or non-cash consideration received by HPARKS, or any Affiliate or any party having an ownership interest in HPARKS or an Affiliate or any concessionaire, sublessee, or licensee relating to or derived from the operation of the Water and Adventure Park during any calendar year from the Rent Commencement Date and continuing through the Term of this Agreement or any renewal term, without any deductions except for:

a. any sales taxes or other admissions and/or amusement taxes imposed by any governmental entities and collected by HPARKS, or

---

Water and Adventure Park Ground Lease & Operating Agreement
City of White Settlement, Texas – Hawaiian Parks - White Settlement, LLC

310

b. "trade-outs" or other arrangements whereby HPARKS engages in advertising, promotion or other trade of the Water and Adventure Park in exchange for non-cash benefits unless the arrangement is with an Affiliate; or

c. the amount of any sales initially included in Gross Revenues that are subsequently subject to refund or credit.

Gross Revenues shall include sales of tickets and passes for entrance to the Water and Adventure Park via internet sales and sales by mail.

1.1.12 Hazardous Material: Any material, substance, waste or matter which is flammable, explosive, corrosive, radioactive or toxic, or which contains asbestos, or is a pesticide, or is a chemical known to cause cancer or reproductive toxicity or which is defined as a hazardous substance, material or waste, or as a toxic substance, material or waste, in any Environmental Regulation.

1.1.13 HPARKS: Hawaiian Parks – White Settlement, LLC, a Missouri limited liability company.

1.1.14 Legal Requirements: All laws, statutes, ordinances, orders, rules, regulations, permits, licenses, authorizations, directives and requirements of all governments and governmental authorities, which now or hereafter may be applicable to HPARKS, the Water and Adventure Park or the operation of the Water and Adventure Park.

1.1.15 Maintenance and Repairs: All routine and ordinary maintenance and repairs to the Water and Adventure Park required to preserve the Water and Adventure Park Improvements in good working repair during their projected useful life which do not constitute Structural Replacements.

1.1.16 Operating Inventory: Consumable items used or held in storage for use in the operation of the Water and Adventure Park, which may include retail shop merchandise, food and beverage inventory, kitchen supplies, paper and plastic ware, bathroom supplies, paper towels, fuel, cleaning materials, fertilizers, pesticides, chemicals, inner tubes and life safety vests, maintenance parts and supplies, office supplies and other similar items and operational supplies for rides and attractions.

1.1.17 Operating Season: The period during which the Water and Adventure Park is open for business each year.

1.1.18 Parking Area: The paved parking areas constructed consistent with the City of White Settlement's code of ordinances for parking up to five hundred (500) cars for the exclusive use of employees, vendors and customers of HPARKS during the Operating Season, located in the areas indicated on *Exhibit B*.

311

1.1.19 Premises: The tract or tracts of land with the dimensions, boundaries, and location depicted in *Exhibit A*, attached hereto and incorporated herein. Once surveyed, the final Premises including parking areas shall measure approximately 14 acres.

1.1.20 Profit and Loss Statement: A statement that sets forth gross revenues and expenses for the calendar year just concluded; the statement shall be in the form attached as *Exhibit C*.

1.1.21 Purchase Reimbursement Obligation: The obligation of CITY under Section 6.6.2 hereof to pay HPARKS for one or more Capital Improvements wholly paid for by HPARKS at an amount equal to the remaining undepreciated value of the Capital Improvements if depreciated on a straight line basis in accordance with Generally Accepted Accounting Principles (the "Purchase Reimbursement Obligation").

1.1.22 Rent Commencement Date: The thirtieth (30th) day after a certificate of occupancy is issued to HPARKS with respect to the Water and Adventure Park Improvements to be constructed upon the Premises by HPARKS pursuant to the Construction Agreement.

1.1.23 Structural Replacements: The replacement, major repair or reconstruction of Water and Adventure Park Improvements, including (a) building roofs, slabs, foundations and walls; heating, ventilation, air conditioning, plumbing, sewer, utility, irrigation and drainage systems; pools and slides; paved areas, including parking lots and circulation walkways; landscaping; and rides and attractions and (b) cost more than $5,000 in any one instance and have a projected useful life of at least five (5) years.

1.1.24 Unforeseen Site Condition: A potential or actual environmental mitigation issue, or other conditions requiring correction or remediation under the environmental laws, or additional construction costs in addition to the costs in the Construction Agreement, but excluding problems with soils unrelated to Hazardous Materials and storm water conditions.

1.1.25 Water and Adventure Park: The aquatic playground and water and adventure park consisting of various park rides, amenities and facilities as generally described in *Exhibit D*, to be constructed on the Premises and operated and maintained pursuant to this Agreement.

1.1.26 Water and Adventure Park Improvements: The buildings, structures, advertising displays, landscaping, infrastructure, utilities, parking lots, driveways and walkways, and other improvements or facilities constructed or installed or to be constructed or installed on the Premises pursuant to the Construction Agreement, except for Capital Improvements.

1.2 Grant of Rights: CITY, in consideration of the provisions of this Agreement, and subject to the terms hereof, grants, lets and leases to HPARKS for the purposes stated herein, the exclusive right to design, plan, construct, equip, operate and maintain a Water

312

and Adventure Park at the Premises, as part of the CITY's park and recreation system. This Agreement is subject to such limitations and restrictions as may, from time to time, be imposed by any governmental entity other than the CITY and subject to the requirements of the Texas Constitution. It is expressly agreed that the CITY retains the ownership of the Water and Adventure Park and the Premises and that the rights granted to HPARKS do not extend to any ownership right whatsoever, other than ownership of its leasehold interest, any personal property paid for solely with HPARKS' funds and HPARKS Funded Improvements (as defined in Section 6.6.2).

      1.3    CITY Warranties: CITY makes the following representations, warranties and acknowledgements as of the date of this Agreement and agrees that such representations, warranties and acknowledgements shall survive and continue thereafter:

      1.3.1    Right to Transfer: CITY warrants that it has the power to transfer the rights and grant quiet enjoyment and exclusive use of the Premises as provided under this Agreement.

      1.3.2.    Environmental Condition: CITY warrants that to the best of its knowledge, there are no Hazardous Materials on or about the proposed site and there are no Unforeseen Site Conditions with regard to the proposed site for the Water and Adventure Park or with respect to the Premises, existing on or prior to the date of this Agreement.

      1.4    Unforeseen Site Condition: If either party becomes aware of an Unforeseen Site Condition with respect to the Premises of a magnitude that will materially interfere with the operation of the Water and Adventure Park, the CITY and HPARKS agree to consider the costs to remedy the Unforeseen Site Condition. The CITY, at its sole discretion, may terminate this Agreement on 90 days prior written notice to HPARKS, given within 180 days of the identification of the newly discovered condition; provided, however, that on the effective date of such termination, and provided HPARKS is not in default of this Agreement, the CITY shall pay HPARKS an amount equal to the sum of HPARKS's total expenditures for construction of the Water and Adventure Park, including the Water and Adventure Park Improvements and the Capital Improvements, plus HPARKS's actual financing costs incurred to fund these expenditures, calculated from the date of payment for each such Water and Adventure Park Improvement or Capital Improvement (this payment, is referred to herein as the "HPARKS Capital Reimbursement").

      1.4.1 HPARKS Option: If CITY notifies HPARKS of termination of this Agreement pursuant to this Section 1.4.1, HPARKS shall have the option, at its expense, to remedy the Unforeseen Site Condition and thereby nullify the termination of this Agreement by the CITY. If HPARKS elects to continue this Lease after notification of termination pursuant to this Section, by remedying the Unforeseen Site Condition at HPARKS's expense, HPARKS shall notify the CITY of such election within 60 days following notice from the CITY of termination due to an Unforeseen Site Condition and proceed diligently to complete the remediation of the Premises.

Water and Adventure Park Ground Lease & Operating Agreement
City of White Settlement, Texas – Hawaiian Parks - White Settlement, LLC

1.5    HPARKS Warranties:  HPARKS makes the following representations, warranties and acknowledgments as of the date of this Agreement and agrees that such representations, warranties and acknowledgments shall survive and continue thereafter:

1.5.1    Status:  HPARKS is a limited liability company duly formed in the state of Missouri and validly existing and authorized to do business under the laws of the State of Texas, and has all power and authority to consummate the transactions contemplated hereby.

1.5.2    Authority:  HPARKS has complied with all laws and regulations concerning its organization, existence and transaction of business. HPARKS, has or at all appropriate times shall have properly obtained, all permits, licenses and approvals necessary to occupy and operate the Water and Adventure Park and in so doing has, or shall have (as appropriate), substantially complied with all applicable statutes, laws, regulations and ordinances.

1.5.3    No Litigation:  There is no litigation, action, suit, or other proceeding pending or threatened against HPARKS, or, upon completion of the construction of the Water and Adventure Park, the Water and Adventure Park which may substantially adversely affect the validity, priority, or enforceability of this Agreement or the construction, use, occupancy or operation of the Water and Adventure Park.

1.5.4    Enforceability:  HPARKS has full right, power and authority to execute and deliver this Agreement and all instruments executed pursuant hereto, and to perform the undertakings of HPARKS contained in this Agreement.

1.5.5    No Breach:  None of the undertakings of HPARKS contained in this Agreement or any agreement executed pursuant hereto violates any applicable statute, law, regulation or ordinance or any order or ruling of any court or governmental entity, or conflicts with, or constitutes a breach or default under, any agreement by which HPARKS is bound or regulated.

1.5.6    Accuracy:  All documents, reports, instruments, papers, data, information and forms of evidence delivered to CITY by HPARKS with respect to this Agreement are accurate and correct, are complete insofar as completeness may be necessary to give the CITY true and accurate knowledge of the subject matter thereof, and do not contain any material misrepresentation or omission.

1.5.7    Taxes:  HPARKS has filed all federal and state tax returns required to have been filed, and have paid all taxes which have become due pursuant to such returns.

2.    TERM:

2.1    Initial Term:  The initial Term of this Agreement commences on the Effective Date and continues until the expiration of forty (40) years from the Rent Commencement Date (the "Initial Term").

2.2     Renewal Term:     CITY grants to HPARKS options to extend this Agreement for four (4) additional five (5) year periods (the Initial Term and any renewal periods shall be referred to herein as the "Term"). Each renewal option may be exercised only if at the time of commencement of that option HPARKS is not in default or breach of any term or condition contained in this Agreement (beyond any applicable notice and cure period). HPARKS shall deliver written notice to the CITY giving notice of renewal or non-renewal at least eighteen (18) months prior to the expiration of the then current term. If no notice is provided this Agreement shall be deemed to be renewed for the applicable option period. If the renewal option is exercised, the extended lease term shall be subject to all the terms and conditions of this Agreement. Annual Lease payments during any renewal period shall be payable as provided in Section 8 hereof.

3.     QUITCLAIM DEED: HPARKS acknowledges that no right of ownership fee or estate is granted by this Lease. At the termination of this Agreement, HPARKS shall execute and deliver to CITY within thirty (30) days a good and sufficient Quitclaim Deed to any rights to any possessory or purported ownership rights or claims to the real estate arising hereunder.

4.     PARKING AND ACCESS TO PREMISES:

4.1     HPARKS to Provide Parking Access and Use: In accordance with the site plan attached hereto as *Exhibit B*, HPARKS shall control all parking on the Premises. CITY acknowledges and agrees that HPARKS may charge a fee for any or all parking spaces with paid parking spaces to be marked in Exhibit B, no overflow parking will be charged a fee.

4.2     Pedestrian Access: CITY shall provide designated pedestrian access to the Water and Adventure Park for customers, employees and service personnel related to HPARKS's activities pursuant to this Agreement in accordance with the plans attached hereto as *Exhibit B*. Prior to the Effective Date, the CITY shall use its best efforts to secure commitments from all appropriate governmental authorities to place, prior to the opening of the Water and Adventure Park, appropriate roadway signage and signals, traffic abatement and speed reduction signage and devices, and other appropriate signage and safety measures, to allow for safe and adequate pedestrian foot traffic, allowing for heavy foot traffic at peak usage, to and from the Water and Adventure Park.

5.     RIGHTS OF HPARKS:

5.1     Permitted Activities: HPARKS may use the Water and Adventure Park Premises for commercial purposes only as follows: all activities normally associated with Water and Adventure Park entertainment facilities, including, without limitation, various water-oriented entertainments, rides, slides, pools, and attractions, ziplines, climbing walls, ropes courses, sky rides, games, competitions, promotions, activity based entertainment, special occasions and group gatherings, concessions, and musical concerts, dramatic or other stage shows or similar presentations, open and available to the general public.

315

5.2    New Activities: Any other rides or attractions not within the scope of the above described activities which HPARKS proposes to conduct at the Water and Adventure Park shall require the approval of CITY, which approval shall not be unreasonably withheld, conditioned or delayed.

5.3    Exclusive Commercial Rights on the Premises:

5.3.1    Uses: The rights conveyed under this Agreement include the exclusive right to commercial use of the Premises for the purposes set forth herein, except as limited by this Agreement.

5.3.2    Entry into Other Agreements: HPARKS shall have the sole and exclusive right to enter into concession, promotion or sponsorship agreements, or exclusive use arrangements relating to the Water and Adventure Park so long as the agreements do not extend beyond the Term of this Agreement. Any such agreement shall be subject to and limited by the applicable terms of this Agreement. HPARKS shall submit any significant or material concession, promotion or sponsorship agreements that depart from the past and ordinary practices in operating family oriented water and adventure park facilities for the approval of CITY, which approval shall not be unreasonably withheld, conditioned or delayed.

5.3.3    Limitations: The parties recognize and acknowledge that certain types of advertising might contain material inappropriate for a public recreational facility. The parties acknowledge that signs, photographs or graphic advertising material relating to medical products or certain types of contemporary clothing might create issues with community norms that would be unacceptable in a park facility. HPARKS shall notify CITY MANAGER or designee of its intent to place advertising or display material and shall provide the content of the proposed and/or intended advertising and/or mock-up of the display materials at least two weeks prior to placement. If the CITY objects to advertising or display materials to be placed at the facility, it shall do so in writing within one (1) week of the placement of the advertising to which objection is taken. HPARKS shall not enter into any promotional or sponsorship arrangements involving tobacco products.

5.3.3.1 Alcoholic beverages may be allowed on the Premises, subject to compliance with all applicable governmental laws and regulations.

5.3.3.2 CITY recognizes that HPARKS does not have complete control over ambient noise or incidental visibility. While the volume of public address announcements will be modulated to the level necessary to be audible to Water and Adventure Park patrons, it is possible that these announcements may be audible outside the Water and Adventure Park. Noise volume and character shall conform to the requirements of any municipal noise regulation then applicable to the Premises.

5.4    HPARKS's Right to Levy Charges; Approval by CITY:

316

5.4.1 Fees: HPARKS may charge fees, rates or prices as follows:

    a. for the initial admission to the Water and/or Adventure Park (except as limited by this Agreement);

    b. for amusement facilities within the Water and Adventure Park;

    c. for use of all other facilities operated by HPARKS upon the Water and Adventure Park;

    d. for sales of food and other concession items at the Park;

    e. for use of the Premises by concessionaires, licensees, and other third parties otherwise authorized by this Agreement; and

    f. for parking, including, with limitation, VIP or valet parking.

    g. any fees related to items (a) through (f) including, but not limited to, fees related to ticket purchases via the internet and other fees that are usual and customary to the entertainment industry.

5.4.2 Revision of Fees: HPARKS shall provide to CITY a complete list of its fees, rates and prices at the Water and Adventure Park. HPARKS reserves the right to add additional concession items or tickets during the season that may not be on the list initially provided to the CITY but agrees that all prices will be similar to those already provided to CITY. HPARKS shall post schedules of prices and charges at ticket boxes, concession outlets, and other conspicuous places.

5.4.3 Benchmark for Fees: All fees, charges and prices for services at the Water and Adventure Park shall be set by HPARKS and shall be on a generally applicable rate schedule comparable to those of other water and adventure parks in Texas of similar size, scope and quality.

5.4.4 Discounted Admissions: Notwithstanding anything to the contrary, residents, current WSISD Students, and employees of the CITY shall receive a 25% discount off the stated front gate daily and season pass rates by showing proof of residence in the City, or employment by the CITY or current WSISD photo ID.

5.5 Control of Ticket Sales: HPARKS shall operate ticket sales for its operations. HPARKS will follow reasonable revenue control procedures to monitor revenues. HPARKS will follow reasonable revenue control procedures approved by CITY to monitor revenues. CITY shall have acess, upon reasonable notice to the ticket sale operations, to review and audit records of receipts and verify accuracy of the operations themselves.

### 5.6 Identifying Signs:

5.6.1 Water and Adventure Park Signs: HPARKS will erect a monument or pylon sign identifying the Water and Adventure Park with associated logo. This cost is included in the Construction Agreement. CITY will give HPARKS the option, at HPARKS's expense, to erect additional signs. CITY shall have the right to review and approve these signs, including, but not limited to, location, size, design, content, method of attachment (if any) and materials used to manufacture the sign; provided, however, CITY's approval shall not be unreasonably withheld, conditioned or delayed. All signs must conform to the CITY's ordinances regarding signage.

5.6.2 Other Signs: HPARKS, subject to the reasonable approval of CITY, may locate other identifying or directional signs at other points on the Premises. HPARKS shall have the right to maintain entry signs at the pedestrian entrance of the Water and Adventure Park.

5.6.3 Directional Signs: CITY agrees to no more than ten (10) directional (way-finder) signs to be placed on high traffic thoroughfares within the CITY, directing guests to the Water and Adventure Park.

5.6.4 Texas Department of Insurance Amusement Ride Inspection Certification: HPARKS agrees to build and operate the Water and Adventure Park in accordance with the State of Texas Amusement Ride Act to include passing annual inspections and posting signage required by the Act. Specific requirements by the Act may be found at http://www.tdi.state.tx.us/commercial/indexamusement.html.

5.7 Promotion and Advertising: Except as otherwise expressly provided herein, HPARKS shall have control over advertising and promotion of the Water and Adventure Park. CITY will use all reasonable efforts to promote the use of the Water and Adventure Park through the use of city-controlled media, publications, utility mailings, and other materials or flyers intended for general distribution. Any HPARKS coupon or inserts will be prepared and printed at HPARKS's expense, and included by the CITY with utility bill mailings at CITY's cost. The CITY shall have the right to prepare and disseminate such additional material as it reasonably deems appropriate for promotion of the Water and Adventure Park as a feature of the CITY's parks and recreation system, provided this material is consistent with the nature and character of the Water and Adventure Park. CITY, in its sole discretion, may provide to HPARKS the right to advertise or promote, on other CITY property, its facilities and activities at the Water and Adventure Park.

5.7.1 CITY's Allocation: Without limiting the provisions set forth in Section 5.7 above, CITY and HPARKS shall collaborate and meet at least once annually to discuss marketing strategy and campaign. CITY shall, as appropriated by the City Council, allocate $35,000 annually to advertise, promote and otherwise market the Water and Adventure Park. HPARKS shall provide necessary marketing guidance to CITY and permission to use

HPARKS logos in any marketing campaign. CITY shall follow all applicable rules and guidelines issued by HPARKS franchise. HPARKS shall have the ability to review and approve all marketing materials and advertisements for compliance with HPARKS's franchise agreements.

6. **DUTIES OF HPARKS:**

6.1 **Quality of Operation:**

6.1.1 **Operating Season:** HPARKS shall operate the Water and Adventure Park for a commercially reasonable period during its Operating Season. The operations shall be of first class quality in all respects, as compared to similar-size operations in Texas. HPARKS shall pursue a promotional program to increase the use of its services and facilities which shall be comparable in scope and cost to promotional activities of HPARKS or its affiliates for other water and adventure parks.

6.1.2 **Operating Hours:** HPARKS shall establish its Operating Season and Schedule of Operating Hours pursuant to operating plans that will maximize economic return from operations, in HPARKS's reasonable business judgment. Prior to each Operating Season, HPARKS shall prepare and submit to CITY the Schedule of Operating Hours.

6.1.2.1 Throughout the Term, and any renewals thereof, during each Operating Season HPARKS shall keep the Water and Adventure Park open for business during ordinary business hours for comparable facilities; provided, however, that this provision shall not apply if the Water and Adventure Park is closed due to inclement weather or Water and Adventure Park's business is temporarily shut down due to casualty, condemnation, fire or other causes beyond the reasonable control of HPARKS.

6.1.2.2 Hours of operation that exceed normal operating hours, shall be subject to the review and consent of the CITY Manager or designee, which consent shall not be unreasonably withheld, conditioned or delayed.

6.2 **HPARKS Personnel:**

6.2.1 **Compensation:** The number of employees working at the Water and Adventure Park, and the compensation (salaries or wages, benefits and commissions) paid to them, shall be reasonably established by HPARKS, but minimal staffing levels shall be comparable to those established by water and adventure parks of similar size and scope in other locations in Texas.

6.2.2 **Training:** HPARKS agrees that at all times its employees shall be clean in appearance and courteous in manner and shall be trained so that the public and patrons at the site shall be treated and served with every reasonable consideration and courtesy. HPARKS agrees that it shall maintain trained and competent aquatic staff in accordance with

Water and Adventure Park Ground Lease & Operating Agreement
City of White Settlement, Texas – Hawaiian Parks - White Settlement, LLC

National Aquatic Safety Company, Jeff Ellis & Associates or Red Cross training standards or other generally applicable industry standards for staffing.

6.2.3 Food Service: Employees of HPARKS or its concessionaires or vendors who work where food and beverage is sold shall comply with federal, state, municipal and county sanitary regulations.

6.3 Capital Improvements, Structural Replacements and Repairs: CITY and HPARKS have agreed to share the various costs and obligations involved in the construction of the Water and Adventure Park in accordance with the terms and conditions of the Construction Agreement entered into by the parties concurrently with this Agreement. HPARKS shall make repairs and new Capital Improvements and Structural Replacements on the Premises as follows:

6.3.1 Repairs due to Initial Construction. HPARKS, at no cost to CITY, shall cause to be made all repairs and replacements to the Water and Adventure Park required because of latent defects or latent faulty installation or faulty construction undertaken pursuant to the Construction Agreement or by a contractor or subcontractor.

6.3.2 Capital Improvements Plan: HPARKS shall annually prepare or revise and submit to CITY a current Capital Improvements Plan that identifies contemplated Capital Improvements and Structural Replacements to the Premises, including any substantial changes or alterations in any existing improvements, projected to occur during the next twenty-four (24) months. The CITY acknowledges that HPARKS will, from time to time over the Term of this Agreement, need to replace certain rides and attractions with new and different rides and attractions to maintain and attract continued interest in the Water and Adventure Park. The CITY further acknowledges that because of the rapidly changing nature of the technologies and improvements available in the water and adventure park industry, the Capital Improvements Plan will contain general descriptions of anticipated improvements and may need to have substantial flexibility with regard to the exact specifications for the improvements and capital items and the vendors for same. Except as provided in Section 6.3.3 hereof, HPARKS shall not be required to carry out any improvements proposed in the Capital Improvements Plan unless the Capital Improvements and Structural Replacements described therein are approved by the CITY and the CITY agrees to fund its 50% share as hereafter provided. If CITY and HPARKS agree to fund new Capital Improvements and/or Structural Replacements, the CITY and HPARKS shall each pay fifty percent (50%) of the cost of such Capital Improvements and/or Structural Replacements; provided, however, CITY's share of the cost of said Capital Improvements and/or Structural Replacements shall be funded from the Sales Tax Escrow Account (defined in Section 12.3 below).

6.3.2.1 Improvements Funded by HPARKS: If the CITY fails to approve a request from HPARKS to fund proposed Capital Improvements and/or Structural Replacements, HPARKS may request that the CITY permit HPARKS to construct such Capital Improvements at HPARKS's expense. CITY agrees it will not unreasonably withhold, condition or delay such consent.

320

6.3.3 Expenditures by HPARKS: During the first five years of this Agreement, HPARKS will expend no less than $500,000 in Capital Improvements and Structural Replacements to the Premises. CITY is not required to participate or match the $500,000 commitment of HPARKS under this Section.

6.3.4 Maintenance and Repair Services. Subject to the terms of this Agreement, HPARKS at its cost and expense shall secure or provide Maintenance and Repairs of the Water and Adventure Park Improvements and Capital Improvements to keep them in good operating condition and in good repair (damage by casualty or condemnation excepted) throughout their useful life and in accordance with all applicable laws. To the extent available, HPARKS may pay the costs of Maintenance and Repairs from funds deposited by HPARKS into the Maintenance Reserve Escrow Account pursuant to Section 12.4 hereof.

6.3.5 Permit and Other Fees: The CITY will waive all CITY building permit and CITY license fees associated with the development of the Water and Adventure Park. The CITY agrees that HPARKS shall not be required to pay any other fees, taxes, or surcharges to the CITY in connection with this project. In addition, the CITY will use its best efforts to see that the Water and Adventure Park and HPARKS are not subject to any other permitting fees, license fees, surcharges, special taxes or assessments, or other fees or charges, in connection with the operation of the Water and Adventure Park, that would not be assessed if the Water and Adventure Park were a CITY operated park facility. CITY and HPARKS agree to work together to jointly prepare and submit any necessary paperwork to inform any applicable governmental authorities and/or taxing or licensing authorities that the Water and Adventure Park and all improvements associated with Water and Adventure Park are and will remain city-owned property, except as otherwise expressly provided herein. HPARKS agrees to defend City should any taxes be assessed and HPARKS will agree to pay any tax assessment. HPARKS will be subject to fees of the City of Fort Worth including Impact Fees and Pass Through fees.

6.3.6 Timing of Improvements: Except as specifically described herein, the timing of any Capital Improvements shall be entirely within the discretion of HPARKS.

6.3.7 Plans: HPARKS agrees and commits to the inclusion in the initial Water and Adventure Park development of similar amenities and plans as identified in *Exhibit D*. The parties acknowledge that the attractions, facilities and improvements will not be static and will change from time to time over the Term of this Agreement.

6.4 Restrictions on Subletting and Concessions: HPARKS shall not sublet or allow occupancy of any portion of the Premises to or by concessionaires or other third parties except in compliance with the following conditions:

a. HPARKS may grant the operation of specialized shops and/or facilities, restaurants and other food providers, to concessionaires on the following conditions; and

b. Each concession granted shall be subject to the applicable terms and conditions of this Agreement, and HPARKS shall first notify CITY that a concession has been granted in compliance with this subsection.

6.5 Non-discrimination: Neither HPARKS nor its employees or concessionaires shall discriminate because of race, religion, color, ancestry, age, national origin, or disability against any person by refusing to furnish any such person any accommodation, facility, service or privilege offered to or enjoyed by the general public. Nor shall HPARKS or its employees publicize the accommodations, facilities, services or privileges in any manner that would directly or inferentially reflect upon or question the acceptability of the patronage of any person because of race, religion, color, ancestry, age, national origin or physical handicap.

6.5.1 Access: HPARKS shall provide disabled persons access to its rides or other entertainments as required by law.

6.5.2 Public Areas: HPARKS may occasionally conduct or engage in public religious activities in the areas of the Water and Adventure Park open to the public (including, but not limited to, proselytizing, preaching, baptizing, passing out religious literature, playing music with overtly religious messages, inviting members of the public to attend religious activities or services, and praying over the speaker system or in any other manner designed to be heard collectively by visitors to the park, whether or not any or all of such persons actually hear such prayer). This Section 6.5.2 is not intended to, nor it shall it be construed to, prohibit private expressions of religious faith by either patrons, employees or contractors of the Water and Adventure Park, nor shall this Section 6.5.2 be interpreted in any way to condone or permit discrimination against any person or group on the basis of religion or religious beliefs or practices. Moreover, nothing in this Agreement is intended to, nor shall be construed to, inhibit or infringe on any individual or group's freedom of association, freedom of religion, or freedom of speech.

6.5.3 Special Events: HPARKS shall not discriminate in any manner prohibited by law in making the Water and Adventure Park available to an entity or group on a private party basis or after normal operating hours.

6.5.4 Access: Except as limited by this paragraph and by applicable law, HPARKS may limit access to the Premises as necessary to prevent disruption or to promote the safety of its customers or employees.

6.6 Acknowledgment of CITY'S Title to Premises, Acquiescence in Ownership by CITY; HPARKS Funded Improvements; HPARKS Shall Commit No Waste:

6.6.1 Title: Except as otherwise expressly provided herein, HPARKS hereby acknowledges the title of CITY in and to the land constituting the Premises and the real property improvements, attractions, rides, and facilities and fixtures and appurtenances constructed by either party on the Premises during the Term of this Agreement and hereby covenants and agrees never to contest said title. Notwithstanding the foregoing or anything to

322

the contrary in this Agreement, if CITY declines to fund its portion of any Capital Improvement and HPARKS instead proceeds with the full funding of such Capital Improvement utilizing its own funds, HPARKS shall take title to any such Capital Improvement upon termination of this Agreement in accordance with Section 6.6.2 below, unless CITY makes the payments required in Section 6.6.2 below.

6.6.2 <u>HPARKS Funded Improvements</u>: At least ninety (90) days prior to termination of this Agreement, CITY shall pay HPARKS the Purchase Reimbursement Obligation for any Capital Improvements wholly funded by HPARKS pursuant to Section 6.3.2.1 ("HPARKS Funded Improvements"). HPARKS Funded Improvements shall not include any Capital Improvements funded by HPARKS pursuant to its obligations under Section 6.3.3. If the CITY declines to pay the Purchase Reimbursement Obligation, the full right and title to such improvements shall transfer to HPARKS, and HPARKS shall have the right to take title to such improvements and remove such improvements from the Premises to the extent that HPARKS can do so without any damage to the other improvements on the Premises. In addition, the CITY acknowledges and agrees that it does not and shall not hold title to any leased or rented improvements, attractions, rides and facilities.

6.6.3 <u>Ownership On Termination</u>: At the termination of this Agreement for any reason: (i) title to any personal property purchased in connection with, and integral to, the operation of the Water and Adventure Park and paid for in whole or in part by the CITY shall vest (or remain vested) in the CITY, which personal property includes, without limitation, all goods, Operating Inventory, merchandise, computers, software, vehicles, and machinery owned in connection with the operation of the Water and Adventure Park; (ii) CITY shall retain full title and ownership of any and all Capital Improvements, Structural Replacements, Water and Adventure Park Improvements, and all other buildings, equipment and facilities paid for in whole or in part by the CITY; and (iii) HPARKS shall take title and ownership of any (a) HPARKS Funded Improvements and (b) personal property which has been paid for entirely by HPARKS. HPARKS may remove the property referred to in clause (iii) above at any time prior to the expiration of thirty (30) days after such termination. In removing HPARKS's property, HPARKS shall not damage or render inoperable any of the other Water and Adventure Park Improvements or Capital Improvements, attractions, rides and facilities at the Water and Adventure Park.

6.6.4 <u>Condition of Water and Adventure Park at Termination</u>: At the expiration or earlier termination of the Term, HPARKS shall terminate its service and vacate the Water and Adventure Park, leaving all remaining improvements, equipment, fixtures and trade fixtures in good and reasonably clean condition, subject to ordinary wear and tear.

6.6.5 <u>Waste</u>: HPARKS shall commit no waste of the Premises and shall be responsible for any damages to the Premises caused by the activities of HPARKS, its agents, employees, guests, and invitees.

6.6.6 <u>Hazardous Materials</u>: HPARKS shall at no time discharge any waste or Hazardous Materials on the Premises. HPARKS shall at no time during the Term of

this Agreement use ·or permit the Premises to be used in violation of any Environmental Regulation. HPARKS shall not exercise any control over environmental conditions or any activities, under this Agreement, at or near the Premises that involve the generation, storage, treatment, or disposal of any Hazardous Material.

6.6.6.1 Any use of fertilizers, herbicides, pesticides or other Hazardous Materials or regulated chemicals by HPARKS or its employees, contractors or subcontractors shall be done in strict accordance with all applicable Environmental Regulations. HPARKS shall provide CITY upon request with copies of all chemicals constituents and Material Safety Data Sheets (MSDS) sheets prior to the application of any fertilizer, herbicide, pesticide or other chemicals to the Premises. HPARKS shall be strictly liable for any spoilage or spills in handling such materials and chemicals.

6.6.6.2 HPARKS shall be responsible for all costs and expenses associated with the remediation of, and liability arising from or related to, damages to the Premises arising from the storage, use or disposal of Hazardous Materials by HPARKS, its employees, agents and contractors, their subcontractors, or invitees after HPARKS enters the Premises to commence construction pursuant to the Notice to Proceed issued under the Construction Agreement.

6.6.6.3. Notwithstanding anything to the contrary in this Agreement, the CITY acknowledges and agrees that the CITY shall have the sole responsibility and obligation with regard to all environmental regulations and compliance, environmental abatement, environmental remediation, claims, causes of action, demands, liability, damages, costs, expense, assessments, penalties, fines, losses, attorney's fees and judgments resulting from or arising out of the existence of any Hazardous Material on the Premises or any other violation or alleged violation of Environmental Regulations on the Premises before the date that HPARKS assumes possession and control of the Premises pursuant to the Construction Agreement (the "Pre-existing Environmental Compliance Obligations"). The CITY further acknowledges and agrees that is will not seek or require any contribution by HPARKS, or impose on HPARKS any such obligations or costs, by failing to fully pay and satisfy its obligations with regard to all Pre-existing Environmental Obligations. This provision shall survive the termination of this Agreement.

6.6.7 Permitted Encumbrances: During the Term of this Agreement, HPARKS (including any of its contractors, sublessees, licensees, and concessionaires) will not in any way encumber or cloud the title to all or any portion of the land constituting the Premises. Notwithstanding the foregoing, however, HPARKS, with the consent of the CITY (which consent shall not be unreasonably withheld, conditioned or delayed), shall have the right to pledge, encumber or grant a lien or security interest in (i) its leasehold interest under this Agreement and (ii) all Capital Improvements (including rides and related facilities) and personal property paid for entirely by HPARKS with any borrowed funds, and the CITY agrees not to oppose or resist the recordation of same with the appropriate governmental authorities. In addition, CITY shall execute such subordination agreements as requested by lenders providing

financing to HPARKS for the cost of such Capital Improvements and personal property, as applicable.

6.6.7.1 Mechanic's Liens Prohibited: HPARKS shall not suffer or permit any mechanic's liens or other liens to be filed against the fee of the Premises nor against HPARKS's leasehold interest in the land nor any improvements on the Premises by reason of any work, labor, services or materials supplied or claimed to have been supplied to HPARKS or to anyone holding the Premises or any part thereof through or under HPARKS. If any such mechanic's lien or materialman's liens shall be recorded against the Premises, or any improvements thereon, HPARKS shall within sixty (60) days cause the same to be removed or, in the alternative, if HPARKS in good faith desires to contest the same, HPARKS shall be privileged to do so, but in such case HPARKS hereby agrees to provide a surety bond, or other collateral, acceptable to CITY and to indemnify and save CITY harmless from all liability for damages occasioned thereby and shall, in the event of a judgment of foreclosure on said mechanic's or materialman's liens, cause the same to be discharged and removed prior to the execution of such judgment.

7. CONSTRUCTION OF CAPITAL IMPROVEMENTS:

7.1 Compliance: HPARKS will comply with all applicable codes and regulations in connection with the construction of the Capital Improvements.

8. LEASE PAYMENTS:

8.1 Annual Lease Payment Computation: During the Term of this Agreement, HPARKS shall make annual lease payments as follows:

a. HPARKS shall pay an amount equal to the CITY's debt service payment incurred by the CITY on the Debt Obligations as its lease payment on the Lease Payment Dates and in the Lease Payment Amounts shown in section 8.2 hereof.

b. Upon payment in full of the Debt Obligations, the annual lease payment payable by HPARKS will be five percent (5%) of Gross Revenues for the applicable calendar year, including any renewal periods.

8.1.1 While the Debt Obligations are outstanding, HPARKS will receive an annual credit against the lease payments payable hereunder in an amount equal to the aggregate sum of the Hotel Occupancy Tax (herein so called) paid by the first five Hotels constructed within the City of White Settlement that receive a certificate of occupancy after the first day that the Water and Adventure Park is opened to the public. As used herein, "Hotel" shall mean any hotel, motel, inn, lodge or similar facility with more than forty (40) rooms for lodging. With the exception of the hotel to be constructed at 8110 W. Freeway, White Settlement, Texas 76108 if certificate of occupancy occurs by December 31, 2014, and the hotel currently under construction at 7801 Scott Street, White Settlement, Texas 76108.

8.2 <u>Annual Payment</u>: HPARKS shall make each lease payment in the Lease Payment Amounts and on the Lease Payment Dates shown below:

| LEASE PAYMENT | | LEASE PAYMENT | |
|---|---|---|---|
| DATE | $ AMOUNT | DATE | $ AMOUNT |
| | | 04/01/2024 | 202,933.50 |
| 10/01/2014 | 500,000.00 | 10/01/2024 | 842,933.50 |
| 04/01/2015 | 200,000.00 | 04/01/2025 | 186,869.50 |
| 10/01/2015 | 600,000.00 | 10/01/2025 | 856,869.50 |
| 04/01/2016 | 300,000.00 | 04/01/2026 | 170,052.50 |
| 10/01/2016 | 600,000.00 | 10/01/2026 | 875,052.50 |
| 04/01/2017 | 300,000.00 | 04/01/2027 | 152,357.00 |
| 10/01/2017 | 700,000.00 | 10/01/2027 | 892,357.00 |
| 04/01/2018 | 300,000.00 | 04/01/2028 | 133,783.00 |
| 10/01/2018 | 900,000.00 | 10/01/2028 | 913,783.00 |
| 04/01/2019 | 400,000.00 | 04/01/2029 | 114,205.00 |
| 10/01/2019 | 800,000.00 | 10/01/2029 | 934,205.00 |
| 04/01/2020 | 600,000.00 | 04/01/2030 | 93,623.00 |
| 10/01/2020 | 696,420.00 | 10/01/2030 | 958,623.00 |
| 04/01/2021 | 246,607.50 | 04/01/2031 | 71,911.50 |
| 10/01/2021 | 796,607.50 | 10/01/2031 | 976,911.50 |
| 04/01/2022 | 232,802.50 | 04/01/2032 | 49,196.00 |
| 10/01/2022 | 812,802.50 | 10/01/2032 | 1,004,196.00 |
| 04/01/2023 | 218,244.50 | 04/01/2033 | 25,225.50 |
| 10/01/2023 | 828,244.50 | 10/01/2033 | 1,030,225.50 |

8.3 <u>Annual Report and Reconciliation</u>: Within sixty (60) days following the close of each calendar year, including the year of the Rent Commencement Date, HPARKS shall furnish to CITY a statement of the Gross Revenues for the entire calendar year signed by an officer or the independent CPA firm of HPARKS on behalf of HPARKS. In the event additional rent is due, such additional rent shall be due and payable within ninety (90) days of the close of the calendar year. In the event that the statement shows that HPARKS has made an overpayment, such overpayment shall be refunded to HPARKS within ninety (90) days of the close of the calendar year.

8.4 <u>Place of Payment</u>: All rent payments shall be made by HPARKS to CITY at CITY's office at City of White Settlement Finance Department, 214 Meadow Park Drive, White Settlement, Texas 76108 or at such other location as shall be designated in writing by CITY.

8.5    Late Payments: In the event a rental payment is not made on or before the last day of the reconciliation period herein provided, HPARKS shall pay to CITY a late charge on unpaid rental payments at a rate of .75 percent per month (nine percent (9.0%) per annum) or the maximum rate permitted by law, whichever is less, from and after the due date thereof until the date of payment.

9.    RECORDS AND REPORTS:

9.1    Financial Reports: Within one hundred twenty (120) days after the end of each calendar year during the Term, commencing after the first Operating Season, HPARKS shall furnish the CITY with a copy of an annual Profit and Loss Statement and an annual balance sheet for the operations of the Water and Adventure Park.

10.    INDEMNITY AGREEMENT:

10.1    Indemnification: HPARKS shall indemnify, defend, protect and hold harmless the CITY, its council members, officers, employees, and volunteers (collectively the "Indemnitees") from and against any and all claims, losses, proceedings, damages, causes of action, liability, costs and expenses (including reasonable attorneys' fees), arising from or in connection with, or caused in whole or in part by (i) any negligent act, or omission of HPARKS or any concessionaire of HPARKS, or their respective contractors, licensees, invitees, agents or employees; (ii) any use of the Water and Adventure Park, or any accident, injury, death or damage to any person or property occurring in, on or about the Premises, or any part thereof, or from the conduct of HPARKS's business or from any activity, work or thing done, permitted or suffered by HPARKS or its contractors, subcontractors, employees or invitees in, on or about the Premises; (iii) any breach or default in the performance of any obligations on HPARKS's part to be performed under the terms of this Agreement, or arising from any negligence of HPARKS, or any such claim or any action or proceeding brought thereon; or (iv) any and all liabilities, obligations, damages, penalties, claims, liens, costs, charges, losses and expenses imposed upon, incurred by or asserted against the Indemnitees by any third party by reason of any claim or lien arising out of work, labor, materials or supplies provided or supplied to HPARKS, its contractors or subcontractors, for the installation or construction of Capital Improvements, and the operation, maintenance or use of the Premises. Notwithstanding the foregoing, the indemnity provided by HPARKS herein expressly excludes any and all liability (i) arising out of an event which occurred prior to the date HPARKS entered the Premises under the Construction Agreement; (ii) arising out of a breach of this Agreement by an Indemnitee or Indemnitees; or (iii) arising out of the willful, reckless or negligent conduct of the Indemnitee(s) or (iv) arising out of the existence of any Hazardous Material on the Premises or any other violation or alleged violation of Environmental Regulations on the Premises before the date that HPARKS assumes possession and control of the Premises pursuant to the Construction Agreement.

327

10.2 Intent: If a claim is made in any forum against Indemnitees for any of the reasons referred to in this Section, and upon resolution of the claim:

(a) there is a finding of negligence by HPARKS and there is no finding by a court of competent jurisdiction that Indemnitees were also negligent or reckless in connection with any of the reasons referred to in this Section, HPARKS shall hold Indemnitee(s) harmless and indemnify them for any damage, loss, expense, or liability resulting from the claim, including all attorneys' fees, costs, and penalties incurred; or

(b) there is a finding by a court of competent jurisdiction that HPARKS was negligent to a greater degree than Indemnitees in connection with any of the reasons referred to in this Section, then HPARKS shall hold Indemnities harmless and indemnify them for any damage, loss, expense, or liability resulting from the claim, including all attorneys' fees, costs and penalties; or

(c) there is a finding by a court of competent jurisdiction that liability resulted from an act of intentional misconduct or recklessness of an Indemnitee or Indemnitees, a breach of this Agreement by an Indemnitee or Indemnitees, or solely from the negligence of an Indemnitee or Indemnitees, then CITY shall, to the extent permitted by law, hold HPARKS harmless and indemnify them for any damage, loss, expense, or liability resulting from that act, including without limitation, all attorney's fees, costs and penalties.

10.3 The Indemnitee shall give HPARKS prompt notice of any event triggering the foregoing indemnity and shall cooperate with the Indemnifying Party in the defense of any cause of action to which the foregoing indemnity relates.

10.4 HPARKS, as a material part of the consideration to the CITY, hereby assumes, except as otherwise provided in this Agreement, all risk of damage to property or injury to person on the Premises.

11. INSURANCE:

11.1 Without limiting any of the other obligations or liabilities of HPARKS, HPARKS agrees to purchase and maintain during the Term and any renewal, and at HPARKS's sole expense, the types and minimum amounts of insurance coverages listed below, together with the coverage provisions and endorsements as indicated:

a. Workers' Compensation Insurance: Workers' Compensation Insurance is subject to the following requirements:

i. Workers' compensation coverage shall be maintained for not less than the Texas Statutory limits.

ii. Employer's Liability Insurance shall be maintained with minimum limits of not less than $250,000 per occurrence and $500,000 aggregate.

iii. The policy shall contain a waiver of subrogation in favor of the CITY.

iv. The policy shall contain a requirement that CITY be given not less than thirty (30) days written notice of cancellation, non-renewal or material change.

b. Commercial General (Public) Liability Insurance: Commercial General (Public) Liability Insurance shall include coverage for Premises/ Operations, Products/ Completed Operations, Independent Contractor's liability, Personal Injury, Explosion/ Collapse/ Underground, and Contractual Liability insuring the indemnity provision contained in this Agreement and fully insuring HPARKS or its subcontractor's liability for bodily injury or death or property damage:

i. Combined limit of $2,000,000 per occurrence for bodily injury and property damage.

ii. Annual aggregate limit of $2,000,000.

iii. Products-Components/Operations Aggregate of $1,000,000.

iv. Personal and Advertising Injury (with employment exclusion deleted) of $1,000,000.

v. Contractual Liability:
Bodily Injury of $1,000,000 each occurrence
Property Damage of $1,000,000 each occurrence

vi. Explosion, Collapse, Underground.

c. Business Commercial Automobile Liability Insurance: Business commercial automobile liability insurance shall include coverage for owned/leased vehicles, non-owned vehicles, and hired vehicles, as follows:

i. Bodily injury limit of $1,000,000 per occurrence.

ii. Property damage limit of $100,000 per occurrence.

iii. The CITY, its officers, employees and agents shall be listed as an additional insured.

d. Commercial Crime Insurance: Commercial crime insurance shall include coverage for employee dishonesty, forgery or alteration, and theft, disappearance and destruction and meet the following:

i.      Coverage shall be on a blanket basis.

ii.     Limits shall be equal to $100,000 per occurrence.

iii.    Such insurance on the improvements, fixtures, furnishings, and equipment of HPARKS on the Premises, shall be in an amount adequate to insure the replacement and/or removal of said property in the event of loss.

e.      Property Insurance:

i.      All Risk Coverage. HPARKS shall obtain and keep in force a policy of insurance covering loss or damage to the Water and Adventure Park, the Water and Adventure Park Improvements, the Capital Improvements and all personal property in the amount of the full replacement value thereof, as the same may exist from time to time, against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief and special extended perils ("all risk," as that term is known in the insurance industry), but excluding damage due to flood, earthquake or terrorist activities. HPARKS shall obtain such endorsements as are recommended by the CITY's risk manager, including, without limitation, an endorsement for changes in building codes, provided such endorsements may be obtained on commercially reasonable terms. CITY shall be the loss payee on such policy. To the extent insurance proceeds are not used to rebuild the Water and Adventure Park Capital Improvements following an insured casualty they shall be divided pro rata by the parties based upon contribution to capital.

ii.     Replacement Value. The "full replacement value" of the property to be insured under this Section shall be determined by the CITY and the Company issuing the insurance policy at the time the policy is initially obtained. Not more frequently than once every two (2) years, either party shall have the right to notify the other that it elects to have the replacement value re-determined by an insurance company. The redetermination shall be made promptly and in accordance with the rules and practices of the insurance company. Each party shall be promptly notified of the results by the company. The insurance policy shall be adjusted according to the redetermination.

11.2    Companies: All policies of insurance shall be written with a company or companies approved and licensed by the Texas Department of Insurance to transact business in the State of Texas with a Best Rating of A or better.

11.3    Certificates: HPARKS agrees to provide CITY with certificates of insurance, endorsements, exclusions, and relevant extracts from the insurance policy, or copies of policies to the CITY evidencing the required insurance coverages and shall provide CITY with certificates or other proof of coverage as requested by CITY of current coverage upon the expiration or renewal of any insurance coverage.

11.4    Additional Insureds: With respect to HPARKS's operations only, the CITY, its council members, officers, employees and volunteers shall be shown as additional

330

insureds on the policies by using endorsement CG 20 26 or broader. The coverage shall contain no special limitations on the scope of protection afforded the CITY.

11.5    Builder's All Risk Coverage.  For all contracts for the construction of Capital Improvements or Structural Replacements undertaken by HPARKS, HPARKS shall purchase and maintain, or require its contractor to purchase and maintain, at all times property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial contract price, plus value of subsequent contract modifications and cost of materials, supplied or installed by others, comprising total value for the entire project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made, or until no person or entity other than the CITY has an insurable interest in the property required by this paragraph to be covered, whichever is later. This insurance shall include interests of the CITY, HPARKS, its subcontractors and sub-subcontractors in the contract.

11.6    Insurance Policy Requirements:

a.    Each insurance policy to be furnished by HPARKS under this Agreement shall include the following conditions by endorsement to the policy (HPARKS shall be primary over any other coverage):

1.    name the CITY as an additional insured as to all applicable policies, except the CITY shall not be an additional insured on the Workers' Compensation/Employer's Liability policy;

2.    each policy shall require that thirty (30) days prior to cancellation, non-renewal or any material change in coverage, a notice thereof shall be given to CITY by certified mail. If the policy is canceled for nonpayment of premium, only ten (10) days written notice to CITY is required;

3.    the policy phrase "other insurance" shall not apply to the CITY where the CITY is an additional insured on the policy;

4.    insurance furnished by HPARKS shall be in accordance with the following requirements;

5.    each policy is to be written through companies duly licensed to transact that class of insurance in the State of Texas;

6.    each liability policy required herein shall be written with an "occurrence" basis coverage trigger;

7.    HPARKS waives subrogation rights for loss or damage against the CITY. Insurers shall have no right of recovery or subrogation against the CITY, it being the intention

331

that the insurance policies shall protect all parties to the contract and be primary coverage for all losses covered by the policies;

8. Companies issuing the insurance policies and HPARKS shall have no recourse against the CITY for payment of any premiums or assessments for any deductibles, as all such premiums and deductibles are the sole responsibility and risk of the HPARKS;

9. Deductible limits on insurance policies exceeding $100,000 require approval of the CITY;

10. Any of such insurance policies required under this Section may be written in combination with any of the others, where legally permitted, but none of the specified limits may be lowered thereby;

11. HPARKS shall provide notice of any claim or litigation that would affect required insurance coverages to the CITY in a timely manner; and

12. Prior to the effective date of cancellation of any policy, HPARKS shall deliver to the CITY a replacement certificate of insurance or proof of reinstatement.

12. MAINTENANCE:

12.1 HPARKS's Responsibilities: HPARKS agrees to maintain any and all facilities at the Water and Adventure Park in good operating and safe condition and clean, good order and repair at its own cost and expense year round and during the entire Term. This shall include keeping the landscaping and groundcover in a healthy and well maintained condition. HPARKS agrees to maintain and operate the Water and Adventure Park in accordance with the State of Texas Amusement Ride Act to include passing annual inspections and posting signage required by the Act.

12.2 Other Maintenance Services: HPARKS further agrees to assume and pay when due all operating expenses for pest control, garbage and waste (hazardous and/or otherwise) removal, janitorial services, and any other operating services accruing or payable in connection with its occupancy of the Premises and, any part thereof, including deposits, fees, or other charges required by the supplier of any such service. HPARKS will use all reasonable efforts to engage businesses located in CITY for these services.

12.3 Escrowed Funds by CITY. During the Term, CITY shall contribute seventy five percent (75%) of the sales tax revenues received from the Water and Adventure Park (the "Sales Tax Escrowed Funds") to an escrow account for deferred or current Structural Replacements and new or updated Capital Improvements. The Sales Tax Escrowed Funds will be funded sixty days after each quarter ending March 31st, June 30th, September 30th, and December 31st of the following year into an account established by CITY and HPARKS at a federally insured bank or other financial institution approved by both parties (the "Sales Tax Escrow Account"). CITY will notify HPARKS of all deposits of Sales Tax Escrowed Funds into the

Sales Tax Escrow Account. The Sales Tax Escrowed Funds may be used by HPARKS only to pay the CITY's 50% share of the cost of Capital Improvements and Structural Replacements approved pursuant to Section 6.3.2. The Escrowed Funds shall be released to HPARKS upon its submission to the City of draw requests complying with the same requirements and procedures as are set forth in the Construction Agreement for the payment of draw requests submitted under the Construction Agreement.

12.4 **Escrowed Funds by HPARKS.** Beginning in the third full calendar year of the Term, HPARKS shall deposit annually four percent (4%) of Gross Revenues received by HPARKS from the Water and Adventure Park (the "Maintenance Reserve Escrowed Funds") into an escrow account established by HPARKS at a federally insured bank or other financial institution approved by CITY and HPARKS (the "Maintenance Reserve Escrow Account"). The Maintenance Reserve Escrowed Funds may be used by HPARKS only to pay the costs of Maintenance and Repairs. The Maintenance Reserve Escrowed Funds for each calendar year will be deposited by March 1 of the following year and HPARKS will notify CITY in writing of all such deposits. Prior to withdrawing any Maintenance Reserve Escrowed Funds, HPARKS will submit a withdrawal request to CITY for CITY's approval, which shall not be unreasonably withheld or delayed.

13. **UTILITIES AND SERVICES:**

13.1 **General Responsibilities for Utilities:** HPARKS shall be responsible for the installation and provision of all utilities within the Premises including sewage lines necessary to and used in connection with its occupancy of the Premises as described in *Exhibit B*, and the removal and disposal of all rubbish, refuse and garbage resulting from park operation.

13.2 **Payment of Utility Charges:** HPARKS shall assume and pay when due all charges for water, gas, power, telephone, light, and any other utility services accruing or payable in connection with its occupancy of the Premises and any part thereof, including deposits, connection fees or charges and equipment rental required by the supplier of any such utility service. If such utility services are provided by the CITY, the CITY agrees to waive any deposits, connection fees, or advance charges with regard to such utilities. CITY agrees to provide for HPARKS any CITY provided utilities on the same terms and conditions as such utilities are provided to other city-owned facilities or, in the case of utilities not provided by the CITY, to use reasonable efforts to secure such utilities for HPARKS on the same terms and conditions as made available to the CITY for other city-owned buildings and facilities.

14. **NOTICES:** All notices hereunder must be in writing and shall be deemed delivered on the day personally delivered, or on the third day from the day sent by registered mail or certified mail, return receipt requested with the U.S. Postal Service, or on the day after the day sent by national overnight courier, to the parties at the following addresses, or at such other addresses as shall be specified by notice.

If addressed to HPARKS:

Hawaiian Parks – White Settlement, LLC
David J. Busch, President
3100 Premier Drive, Suite 200
Irving, TX 75063

With a copy to:

David J. Busch
4670 Gresham Drive
El Dorado Hills, CA 95760

And a copy to:

DeSimone Pearson, LC
4324 Belleview
Kansas CITY, MO 64111
Attn: Brad I. Pearson

If addressed to the CITY:

City Manager
City of White Settlement
214 Meadow Park Drive
White Settlement, Texas 76108

With a copy to:

City Attorney
City of White Settlement
214 Meadow Park Drive
White Settlement, Texas 76108

With a copy to:

City Secretary
City of White Settlement
214 Meadow Park Drive
White Settlement, Texas 76108

15. WAIVER OF AGREEMENT TERMS: No waiver by either party at any time of any of the terms, conditions or covenants of this Agreement shall be deemed as a waiver at any time thereafter of the same or of any other term, condition or covenant of herein contained, nor of the strict and prompt performance thereof.

16. ASSIGNMENTS:

Water and Adventure Park Ground Lease & Operating Agreement
City of White Settlement, Texas – Hawaiian Parks - White Settlement, LLC

334

16.1  No Transfer Without CITY Consent: No transfer, assignment or corporate merger by HPARKS that affects this Agreement or any part thereof or interest therein directly or indirectly, voluntarily or involuntarily, shall be made unless such transfer, assignment or corporate merger is first consented to in writing by CITY as required by, and pursuant to the provisions of this Paragraph. In deciding whether to consent, CITY may consider the financial capability and stability of the proposed assignee and the experience of the management of the assignee in operating water and adventure parks; provided; however, CITY's consent shall not be unreasonably withheld, conditioned or delayed.

17.  COMPLIANCE WITH LAWS: HPARKS shall:

a.  comply with all applicable federal, state and local laws; and

b.  not discriminate against any person on account of race, color, creed, religion, sex, marital status, disability, national origin or ancestry in its performance under the terms of this Agreement.

18.  TIME OF ESSENCE: Time shall be of the essence in the performance of this Agreement.

19.  PARAGRAPH TITLES: The paragraph titles in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of intent of this Agreement or in any way affect this Agreement.

20.  ENTIRE UNDERSTANDING: This Agreement contains and embraces the entire Agreement between the parties hereto and neither it nor any part of it may be changed, altered, modified, limited or extended orally except by written amendment thereto signed by CITY and HPARKS, or their successors in interest.

21.  RELATIONSHIP OF THE PARTIES: While engaged in carrying out and complying with the terms and conditions of the Agreement, HPARKS is and shall be an independent contractor and shall not, with respect to its acts and omissions, be deemed an officer, employee, agent or representative of CITY. HPARKS shall not in any manner, whether directly or by implication, represent that HPARKS is an officer, employee, agent or representative of CITY. The fact that CITY has the right to observe HPARKS's work or to exercise other prerogatives under this Agreement or by its regulatory authority is not intended to and shall not affect the status of HPARKS as an independent contractor.

22.  REGULATORY AUTHORITY: HPARKS acknowledges that it is extremely important to CITY that all activities conducted by HPARKS under this Agreement strictly comply with all CITY ordinances, regulations, permit requirements, and laws. Nothing contained in this Agreement shall limit the regulatory authority of CITY to terminate some or all of the activities of HPARKS for a violation of any CITY ordinance, regulation, permit requirement, or other law. Except for the provisions of this Agreement relating to the

Water and Adventure Park Ground Lease & Operating Agreement
City of White Settlement, Texas – Hawaiian Parks - White Settlement, LLC

335

indemnification of employees, agents and representatives of either party, there are no third-party beneficiaries to this Agreement and no third-party beneficiaries are intended by implication or otherwise.

23. INDEPENDENT CONTRACTOR: Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent or of partnership, joint venture, or employment, it being expressly understood and agreed that no provision contained in this Agreement nor any act or acts of the parties hereto shall be deemed to create any relationship between the parties other than the relationship of independent parties contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither party has the authority to enter into contracts or to assume any obligation of the other nor to make warranties or representations on behalf of the other except in accordance with the express terms of this Agreement or as otherwise authorized in writing by the other.

24. MISCELLANEOUS PROVISIONS: This Agreement and the Construction Agreement supersede all agreements, whether written or oral, previously made between the parties relating to the subject matter hereof. There are no other understandings or agreements between the parties hereto with respect to the subject matter hereof except for the Construction Agreement. Any consent or approval requested by either party shall not be unreasonably withheld or delayed by the other party. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. Except as otherwise provided herein, the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and the respective successors and permitted assigns. Any failure of any party hereto to comply with any obligation, covenant, agreement or condition herein may be waived by the other party, but any such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver or estoppel with respect to any subsequent or future failure.

25. FORCE MAJEURE; DAMAGE; CONDEMNATION:

25.1 Procedure: In the event of a Force Majeure Event, the time for such performance shall be extended by the amount of time of such delay, but no longer than the amount of time reasonably occasioned by the delay. The party claiming delay of performance as a result of Force Majeure Event shall deliver written notice of the commencement of any such delay resulting from such Force Majeure Event not later than seven (7) days after the claiming party becomes aware of the same, and if the claiming party fails to so notify the other party of the occurrence of a Force Majeure Event causing such delay and the other party shall not otherwise be aware of the Force Majeure Event, the claiming party shall not be entitled to avail itself of the provisions for the extension of performance contained in this paragraph.

25.2 Damage or Destruction Prior to Debt Obligation Defeasance Date: Should the Water and Adventure Park be substantially damaged by a Force Majeure Event occurring prior to payment in full of the Debt Obligation (the "Bond Defeasance Date"), CITY

and HPARKS may agree to terminate this Agreement. If they agree to do so, in that event any and all insurance proceeds payable as a result of the Force Majeure Event shall be divided by the parties pro rata based on their proportionate share of each in the total investment in the cost to acquire and construct the Water and Adventure Park Improvements and Capital Improvements; thereafter neither party shall have any further obligation to the other party under this Agreement, except with respect to liabilities occurring and based upon events occurring prior to the effective date of such termination. The Water and Adventure Park shall be deemed to have been "substantially damaged" if the cost of restoring the Water and Adventure Park to its condition immediately before such damage, including the cost paid by any insurance proceeds, is fifty percent (50%) or more of the entire replacement cost of the Water and Adventure Park Improvements. If the parties do not agree to terminate this Agreement, then the parties agree to apply all insurance proceeds to commence and complete, with all due diligence, restoration of the Water and Adventure Park to its condition and character just prior to the occurrence of such casualty.

25.3 Damage or Destruction after Debt Obligation.Defeasance Date: Should the Water and Adventure Park be substantially damaged (as defined above) by a Force Majeure Event occurring on or after the Bond Defeasance. Date, HPARKS, by written notice to CITY given within sixty (60) days following the occurrence of such event, shall have the right to terminate this Agreement. In such event, the parties shall apportion the insurance proceeds based on the proportionate share of each in the total investment in the cost to acquire and construct the Water and Adventure Park Improvements and Capital Improvements. After such termination and apportionment, neither party shall have any further obligation to the other party under this Agreement, except with respect to liabilities occurring and based upon events occurring prior to the effective date of such termination. If this Agreement is not terminated, then the parties agree to apply all available insurance proceeds and use all due diligence to commence and complete restoration of the Water and Adventure Park to its condition and character just prior to the occurrence of such casualty.

25.4 Complete Condemnation. If the whole of the Premises shall be appropriated or condemned under power of eminent domain or by any competent authority for any public or quasi-public use or purpose during the term of this Agreement, or any renewal or extension hereof, all compensation awarded for any such appropriation or taking of CITY's ownership interest in the Premises shall be the property of CITY, and HPARKS hereby assigns to CITY all of HPARKS's rights, title and interest in and to receive any portion of said award, except that HPARKS reserves unto itself the right to prosecute its claim for a separate award for damages for the termination of this Agreement and its loss of its interest under this Agreement caused by such appropriation or taking, together with damages based on the value of HPARKS's personally erected or installed on the Premises and the damages HPARKS may sustain to the business operated by HPARKS on the Premises, including, but not limited to, goodwill, patronage and the removal, relocation and replacement costs and expenses caused by such appropriation or taking. In such event, this Agreement shall terminate when HPARKS can no longer use the Premises in the manner herein intended, or when possession thereof shall be required by the appropriating or condemning authority, whichever shall first occur, but such termination of this Agreement shall not change, preclude or affect HPARKS's right to an award as hereinbefore provided.

337

25.5 Partial Condemnation. In the event that a part of the Premises shall be appropriated or condemned and: (i) if the part so taken shall include the Capital Improvements on the Premises, or any material part thereof; (ii) the part so taken shall remove ten percent (10%) or more of the depth or width of the Premises as measured from front to back or side to side; or (iii) the part so taken shall eliminate ten (10%) percent of the parking places , then in any such event, at any time within a period of one hundred eighty (180) days after the date. when possession of the part of the Premises so taken shall be acquired by the appropriating or condemning authority, HPARKS may elect to terminate this Agreement by written notice to PCDC. In the event HPARKS shall exercise such election to terminate this Agreement, HPARKS shall have the right to prosecute its claim for a separate award for damages for the termination of this Agreement caused by such partial appropriation or taking, together with damages based on the value of HPARKS's personalty and business interest, in the same manner and to the same extent, as that herein before reserved by HPARKS in the event that the whole of the Premises were appropriated or condemned; provided that in no event shall such separate award to HPARKS reduce the sums payable to CITY with respect to the loss of the Premises and the Capital Improvements. In the event HPARKS shall fail to exercise such option to terminate this Agreement, then and in either such event, CITY, with reasonable promptness, shall make necessary repairs to and alterations of the Improvements on the Premises for the purpose of restoring same to a functional economic unit, susceptible to the same use as that which was in effect immediately prior to such taking and to the extent that such repairs are necessitated by such appropriation or condemnation. In the event CITY fails or refuses to do so, then HPARKS may, on thirty (30) days prior written notice and opportunity to cure to CITY, cancel the Lease or complete the repairs at CITY's expense.

25.6 Rent Reduction. In the event that a part of the Premises shall be appropriated or condemned and if HPARKS shall fail to exercise its option to terminate this Lease, then in such event, this Lease shall continue in full force and effect and shall terminate only as to that part of the Premises so taken. In such event the rent required to be paid under this Lease shall be reduced, as of the date when possession of such portion of the Premises shall be required by the appropriating or condemning authority, by a proportional amount equal to the ratio, expressed as a percentage that the land area so taken bears to the total land area of the Premises.

26. DEFAULT; TERMINATION:

26.1 HPARKS's Default: The occurrence of the following shall constitute a default by HPARKS:

HPARKS's failure to perform any covenant or provision of this Agreement, if the failure to perform is not cured within sixty (60) days after delivery by the CITY to HPARKS of written notice of default specifying with particularity the nature of the default. If the failure to perform does not involve the payment of rent or other financial obligation and cannot reasonably be cured within sixty (60) days, HPARKS shall not be in default of this Agreement if HPARKS commences to cure the failure to perform within the sixty (60) day period and thereafter diligently and in good faith prosecutes the cure to completion.

26.2 CITY's Default: The occurrence of the following shall constitute a default by the CITY: the CITY's failure to perform any covenant or provision of this Agreement, if the failure to perform is not cured within sixty (60) days after delivery by HPARKS to the CITY of

Water and Adventure Park Ground Lease & Operating Agreement
City of White Settlement, Texas – Hawaiian Parks - White Settlement, LLC

written notice of default specifying with particularity the nature of the default. If the failure to perform cannot reasonably be cured within sixty (60) days, the CITY shall not be in default of this Agreement if the CITY commences to cure the failure to perform within the sixty (60) day period and thereafter diligently and in good faith prosecutes the cure to completion.

26.3. Remedies and Early Termination:

26.3.1 CITY's Remedies: If any default by HPARKS under Section 26.1 shall continue uncured, following notice of default as required by this Agreement, for the period applicable to the default under the applicable provision of this Agreement, the CITY may, at its election, terminate this Agreement by giving HPARKS written notice of termination and re-enter the Premises and this Agreement shall terminate immediately upon receipt of such written notice. The foregoing remedies are in addition to all other rights and remedies provided by law or equity, to which the CITY may resort cumulatively or in the alternative, whether this Agreement has been terminated or not.

26.3.2 HPARKS's Remedies: If any default by the CITY under Section 26.2 shall continue uncured, following notice of default as required by this Agreement, for the period applicable to the default under the applicable provision of this Agreement, HPARKS may at its election terminate this Agreement by giving the CITY written notice of termination and this Agreement shall terminate thirty (30) days after the date such written notice is received by the CITY. The foregoing remedies are in addition to and not in lieu of all other rights and remedies provided by law or equity, including an action for damages or for injunctive relief, to which HPARKS may resort cumulatively or in the alternative, whether this Agreement has been terminated or not.

26.3.3 Damages: Neither CITY nor HPARKS shall be liable for special, exemplary, consequential or punitive damages due to default under this Agreement.

27. NON-COMPETE AGREEMENT: The CITY agrees, to the extent permitted by law, to not compete with HPARKS by building, developing, sponsoring and/or operating a water and adventure park with attractions similar to the Water and Adventure Park.

28. APPLICABLE LAW AND VENUE: This Agreement shall be construed and interpreted in accordance with, and shall be governed by, the laws of the State of Texas and venue for any judicial action under this agreement shall be in Tarrant County, Texas.

29. NO PRESUMPTION REGARDING DRAFTER: The terms and provisions of this Agreement have been extensively negotiated and discussed between the CITY and HPARKS. This document reflects their mutual agreement regarding the subject matter of this document. Because of the nature of such negotiations and discussions, neither the CITY nor HPARKS shall be deemed or construed to be the drafter of this Agreement. Therefore, no presumption for or against the drafter shall be applicable for interpreting or enforcing this Agreement.

339

30. LIMITED WAIVER OF SOVEREIGN IMMUNITY; SEVERABILITY: The CITY expressly waives and agrees, to the extent permitted by law, not to plead, claim, or take advantage of, its sovereign immunity and any defenses that may be asserted on the basis of sovereign immunity, and any other defenses of unenforceability, with respect to (i) suit; (ii) the rights and remedies of HPARKS pursuant to this Agreement to require CITY to pay, under certain circumstances set forth herein, the Purchase Reimbursement Obligation, and (iii) any request or effort by HPARKS to seek injunctive relief and/or specific performance with regards to the performance by CITY of its obligations pursuant to this Agreement. These limited waivers of sovereign immunity shall clarify and expand, but are not intended to, now shall they, limit or reduce in any way the scope of any waivers of sovereign immunity otherwise granted by operation of law, statute or common law. If any term, condition, covenant or obligation of this Agreement shall be determined to be unenforceable, invalid, or void, such determination shall not affect, impair, invalidate or render unenforceable any other term, condition, covenant or obligation of this Agreement.

31. ATTORNEYS' FEES: The prevailing party in the adjudication of any proceeding relating to this Agreement shall be authorized to recover its reasonable attorney's fees pursuant to Section 271.153 of the Texas Local Government Code.

32. TAXES, ASSESSMENTS, AND FEES: CITY shall pay and fully discharge all ad valorem real and personal property taxes, if any, assessed against the CITY as owner of the premises and any personal property located thereon; provided, however, HPARKS shall pay all taxes, if any, levied, assessed or imposed upon all personal property owned entirely by HPARKS. CITY agrees that no property taxes shall be assessed to HPARKS for the Premises and the Water and Adventure Park Improvements during the Term. CITY agrees that all construction related purchases in connection with the construction of the Water and Adventure Park and the Capital Improvements and related expenditures shall be exempt from sales tax. The CITY agrees to cooperate fully with HPARKS in resisting and opposing the imposition of any taxes levied, assessed, or imposed upon the Water and Adventure Park Improvements or construction-related purchases that are not ordinarily levied, assessed, or imposed upon CITY owned property, projects or purchases of like kind and nature. HPARKS shall have the right in good faith to contest any such taxes, charges, and assessments for which it is liable under this Section and shall be obligated to pay the contested amount only if and when finally determined to be due. HPARKS shall give notice to CITY of its intent to contest any such taxes, charges, or assessments, the amount thereof, and the entity to which such taxes, charges, or assessments are purportedly owed.

33. AUDIT: Upon reasonable request, HPARKS shall furnish CITY a copy of HPARKS's records, documents, agreements and other instruments to ensure HPARKS's compliance with the covenants set forth in this Agreement. HPARKS shall maintain such records as are deemed reasonably necessary by the CITY and auditors of CITY, or such other persons or entities designated by CITY, to ensure proper accounting for all costs, performances, and number of jobs created or retained related to this Agreement. Upon no less than fifteen (15) days advance notice and request, HPARKS shall grant access to all paper and electronic records, books, documents, accounting procedures, practices or any other items relevant to the

340

performance of this Agreement to CITY, or such other persons or entities designated by CITY for the purposes of inspecting, auditing, or copying such books and records; provided, however, CITY may request such access no more than one time in any calendar quarter unless HPARKS is then in default under this Agreement. CITY shall conduct any such inspection, audit or copying of such books and records. In a manner that will not disrupt or interfere with HPARKS's ordinary operations and conduct of business.

34. MEMORANDUM OF LEASE; ESTOPPEL CERTIFICATES: HPARKS and CITY agree to sign and properly record a Memorandum of Lease, memorializing the terms and conditions of this Agreement, for the purpose of placing third parties on notice of the existence and terms and conditions of this Agreement. HPARKS and CITY shall, at any time and from time to time upon not less than ten (10) days' prior written request by the other party, execute, acknowledge and deliver to the requesting party, a statement in writing certifying (a) its ownership of the interest of CITY or HPARKS hereunder, as the case may be, (b) that this Lease is unmodified and in full force and effect (or if there have been any modification, that the same is in full force and effect as modified and stating the modifications), (c) the dates to which the lease payments and any other charges have been paid, (d) that, to the best knowledge of the certifying party, no default hereunder on the part of the requesting party exists (except that if any such default does exist, the certifying party shall specify such default), Upon request by HPARKS, CITY's estoppel certificate also shall be addressed to the leasehold interest mortgagee, if any.

*[Signature page follows]*

Water and Adventure Park Ground Lease & Operating Agreement
City of White Settlement, Texas – Hawaiian Parks - White Settlement, LLC

IN WITNESS WHEREOF, the parties hereto have affixed their signatures, as of the date first above written.

HAWAIIAN PARKS - WHITE SETTLEMENT, LLC, a Missouri limited liability company,

By: _____
David J. Busch, President

Date Executed: _____11-11-13_____

WHITE SETTLEMENT ECONOMIC DEVELOPMENT CORPORATION - (EDC), a Texas non-profit corporation,

By: _____
Linda Ryan, President

Date Executed: _____11-11-13_____

CITY OF WHITE SETTLEMENT, TEXAS, a Texas home-rule municipality,

By: _____
_____, City Manager

Date Executed: _____11-11-13_____

ATTEST:

_____, City Secretary

APPROVED AS TO FORM:

_____, City Attorney

Water and Adventure Park Ground Lease & Operating Agreement
City of White Settlement, Texas – Hawaiian Parks - White Settlement, LLC

342



343



EXHIBIT "C"

## White Settlement
## Profit and Loss Statement

Ordinary Income/Expense

| | | Jan - Dec |
|---|---|---|
| Income | | |
| | 100 Admission Income | 0.00 |
| | 200 Food & Beverage | 0.00 |
| | 225 Cooler Income | 0.00 |
| | 251 Cabanas / Pavilions | 0.00 |
| | 252 Locker Rentals | 0.00 |
| | 275 Retail Income | 0.00 |
| | 290 Miscellaneous Income | 0.00 |
| | 299 Sponsorship Income | 0.00 |
| | Interest - CD | 0.00 |
| Total Income | | 0.00 |
| | | |
| Gross Profit | | 0.00 |
| | | |
| Expense | | |
| | 300 Cost of Sales - F&B | 0.00 |
| | 300 Cost of Sales - Retail | 0.00 |
| | 301 Corporate Overhead | 0.00 |
| | 400 Advertising Expense | 0.00 |
| | 500 Insurance | 0.00 |
| | 600 General Expenses | 0.00 |
| | 650 Repair & Maintenance | 0.00 |
| | 675 Supplies | 0.00 |
| | 700 Payroll Expenses | 0.00 |
| | 750 Fringes/Taxes | 0.00 |
| | 800 Professional Fees | 0.00 |
| | 900 Taxes & Licenses | 0.00 |
| | 925 Transaction Fees | 0.00 |
| | 950 Travel Expense | 0.00 |
| | 975 Utilities & Telephone | 0.00 |
| | Miscellaneous Expense AP | 0.00 |
| | Property Rent | 0.00 |
| Total Expense | | 0.00 |
| | | |
| Net Ordinary Income | | 0.00 |



# EXHIBIT "2"

# SourceCapital

75 14th Street Suite 2700 Atlanta, Georgia 30309 | *office:* 404.249.9330 | *fax:* 770.234.4152 | www.source-cap.com

May 15, 2015
For Immediate Release

## Hawaiian Falls Receives Investment from Source Capital, LLC

Horizon Family Holdings, LLC, the owner and operator of seven Hawaiian Falls water parks and two adventure parks in Texas, received an additional investment from an affiliate of Source Capital, LLC, an Atlanta-based private equity firm, the company announced today. David Busch, the founder and CEO of Horizon, will continue in his current position.

In announcing the acquisition Source Capital Partner Ben Emmons said "we are excited to expand our relationship with Hawaiian Falls and look forward to pursuing a number of initiatives with management to improve upon the 14-year operating history of Hawaiian Falls. He said, "When the parks open on Memorial Weekend, we want to make certain our guests have a fun and safe experience. Hawaiian Falls represents quality, wholesome entertainment for literally hundreds of thousands of Texas families and we look forward to continuing and even enhancing the high standards of service set by the parks' employees."

He continued, "Another high priority is to ensure our staff of 2,000 Ambassadors have a good work environment and are trained and ready to give our guests the best experience possible."

In commenting on the acquisition David Busch, Hawaiian Falls CEO, said, "We are fortunate to have investors that are as committed as we always have been to serving our Hawaiian Falls guests, our communities and our employees. Our parks' philosophy of "serving the community by bringing families closer together" will continue and thrive under our new ownership."

Busch stated Source Capital has been an investor in Horizon since December, 2013 and has been a supportive partner during the company's expansion over the last two years. "The Source Capital team has observed our operation over two operating seasons and concluded that the parks represent a solid investment for their portfolio," Busch said. "We are thrilled in every way to be a part of their family."

All parks open to the public Saturday, May 23. For specific operating hours and directions go to hfalls.com or facebook.com/hfalls.

#########

About Hawaiian Falls

Hawaiian Falls opened its first park in 2003 in Garland and currently has water parks in The Colony, Mansfield, Roanoke and Waco. In 2014 the company premiered a new family entertainment concept in White Settlement and Pflugerville respectively, which includes Hawaiian Falls water park, Hawaiian High Adventures challenge and adventure park and the 22,500 square foot Aloha Event Center.

About Source Capital

Source Capital, LLC is a private equity firm founded in 2002 which makes both equity and debt investments in mature, lower middle-market U.S. companies across a range of industries. Source Capital has completed 49 transactions over the last 13 years and invested across a broad selection of industries including: business services, light manufacturing, consumer products & services, healthcare, and value-added distribution. Source Capital has offices in Atlanta and San Francisco.

# EXHIBIT "3"

# Source Capital

75 14th Street Suite 2700 Atlanta, Georgia 30309 | *office:* 404.249.9330 | *fax:* 770.234.4152 | *www.source-cap.com*

March 31, 2015

Mr. Phil Bray.
Director of Finance
City Of White Settlement
White Settlement, TX 76108

Dear Phil,

Thanks again for the time you provided to myself and the Hawaiian Falls team last week. It was good to meet with you and Jim as we felt a face to face introduction was the best path to making sure all the parties operate on the same page. I think we can both agree that 2014 did not play out as either of us anticipated. That being said, we feel the issues were external and tied to the poor execution of expansion and not related to the operation of the waterparks. This point has been validated by the strong performance of season pass, group sales and events at all the parks (up 20%). With the new parks fully completed and ready for 2015, management has refocused its efforts on marketing and sales.

As you requested, I have outlined below our plan going forward to stabilize the company and most importantly make good on the obligations owed to the city of White Settlement.

- Source Capital and Capital One Bank have agreed to provide up to $1,000,000 ("Initial Capital Agreement") to ensure that all the parks are prepared for the opening in mid-May. The documentation is final and we will be closing on April 3.
- Source and David Busch signed a Letter of Intent ("Source/Busch Capital Agreement") in which Source will be injecting up to $5,000,000 into the Company. The documentation is in the legal process and we are targeting an April 30th close.
- Upon closing of the Source/Busch Capital Agreement, Source Capital will be the controlling owner of Horizon Family Entertainment, and specifically as it relates to your team, the sole owner of Hawaiian Parks, White Settlement LLC.
- Source will need a consent from the city of White Settlement prior to close allowing for the change of control. We will be providing a standard consent document in the next couple of weeks.
- Dave Busch will be remaining in his role as CEO and you should see no change in the day to day operations.
- Upon the closing of the Source/Busch Capital Agreement we will make the 1st of 3 payments (May 15th/June 15th/July 15th)- each payment will be for $191,333 for a total of $575,000. This will cover all the 2014 past due lease payments ($375,000) and the amounts owed to date for 2015 ($200,000).
- The remaining 2015 payment- $600,000- will be made as required in October of 2015.

350

## Source Capital

75 14th Street  Suite 2700  Atlanta, Georgia 30309  |  *office:*  404.249.9330  |  *fax:*  770.234.4152  |  *www.source-cap.com*

As outlined, this process is a 2 step path in which the Initial Capital Agreement will ensure we are ready for the 2015 season and the Source/Busch Capital Agreement, along with the 2015 season performance, will ensure we have enough cash to resolve all the 2014 hold over obligations, handle the 2015 commitments as they come due, and carry enough reserves into the offseason.

I look forward to working with you and your team in getting this completed. Please feel free to contact me at your convenience with any questions or concerns.

All the best,

Benjamin Emmons
Managing Director
Source Capital Partners
75 14th Street
Atlanta GA 30309
404-294-9249

351

**APPENDIX TAB "2"**

# SourceCapital

75 14th Street  Suite 2700  Atlanta, Georgia 30309  |  *office:* 404.249.9330  |  *fax:* 770.234.4152  |  *www.source-cap.com*

March 31, 2015

Mr. Phil Bray
Director of Finance
City Of White Settlement
White Settlement, TX 76108

Dear Phil,

Thanks again for the time you provided to myself and the Hawaiian Falls team last week. It was good to meet with you and Jim as we felt a face to face introduction was the best path to making sure all the parties operate on the same page. I think we can both agree that 2014 did not play out as either of us anticipated. That being said, we feel the issues were external and tied to the poor execution of expansion and not related to the operation of the waterparks. This point has been validated by the strong performance of season pass, group sales and events at all the parks (up 20%). With the new parks fully completed and ready for 2015, management has refocused its efforts on marketing and sales.

As you requested, I have outlined below our plan going forward to stabilize the company and most importantly make good on the obligations owed to the city of White Settlement.

- Source Capital and Capital One Bank have agreed to provide up to $1,000,000 ("Initial Capital Agreement") to ensure that all the parks are prepared for the opening in mid-May. The documentation is final and we will be closing on April 3.
- Source and David Busch signed a Letter of Intent ("Source/Busch Capital Agreement") in which Source will be injecting up to $5,000,000 into the Company. The documentation is in the legal process and we are targeting an April 30th close.
- Upon closing of the Source/Busch Capital Agreement, Source Capital will be the controlling owner of Horizon Family Entertainment, and specifically as it relates to your team, the sole owner of Hawaiian Parks, White Settlement LLC.
- Source will need a consent from the city of White Settlement prior to close allowing for the change of control. We will be providing a standard consent document in the next couple of weeks.
- Dave Busch will be remaining in his role as CEO and you should see no change in the day to day operations.
- Upon the closing of the Source/Busch Capital Agreement we will make the 1st of 3 payments (May 15th/June 15th/July 15th)- each payment will be for $191,333 for a total of $575,000. This will cover all the 2014 past due lease payments ($375,000) and the amounts owed to date for 2015 ($200,000).
- The remaining 2015 payment- $600,000- will be made as required in October of 2015.

683

75 14th Street  Suite 2700  Atlanta, Georgia 30309  |  *office:* 404.249.9330  |  *fax:* 770.234.4152  | *www.source-cap.com*

As outlined, this process is a 2 step path in which the Initial Capital Agreement will ensure we are ready for the 2015 season and the Source/Busch Capital Agreement, along with the 2015 season performance, will ensure we have enough cash to resolve all the 2014 hold over obligations, handle the 2015 commitments as they come due, and carry enough reserves into the offseason.

I look forward to working with you and your team in getting this completed. Please feel free to contact me at your convenience with any questions or concerns.

All the best,

Benjamin Emmons
Managing Director
Source Capital Partners
75 14th Street
Atlanta GA 30309
404-294-9249

# APPENDIX TAB "3"

| | | |
|---|---|---|
| CITY OF WHITE SETTLEMENT, TEXAS and the WHITE SETTLEMENT ECONOMIC DEVELOPMENT CORPORATION, | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | 48th JUDICIAL DISTRICT |
| HAWAIIAN PARKS- WHITE SETTLEMENT, LLC, a Missouri limited liability company, BENJAMIN S. EMMONS, SOURCE CAPITAL LLC, a Georgia limited liability company and CLINTON HILL, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | TARRANT COUNTY, TEXAS |

## AFFIDAVIT OF PHILIP BRAY

STATE OF TEXAS          §
TARRANT COUNTY       §

BEFORE ME, the undersigned authority, on this day personally appeared Philip Bray, a person known to me, who, being duly sworn, on his oath states and deposes:

1.      "My name is Philip Bray. I have never been convicted of a crime of moral turpitude. All the statements contained in this affidavit are true and correct and are based upon my personal knowledge.

2.      I was the chief financial officer for the City of White Settlement, Texas from December 19, 2011 until February 17, 2017. As CFO, my responsibilities included overseeing all of the financial affairs of the City. These responsibilities included accounting for cash receipts received by the City from various taxes and fees as well as all

<u>**AFFIDAVIT OF PHILIP BRAY**</u>                                                                 **PAGE 1**

603

of the expenditures of the City. While CFO, I maintained an office at the city hall of White Settlement, Texas.

3. I am familiar with the Hawaiian Falls water park located in White Settlement (the "Park"). The City paid for the construction of the Park and purchased all of the personal property that was used in the operation of the Park. The City of White Settlement, as the owner of the Park, entered into a Ground Lease and Operating Agreement ("Lease Agreement") with Hawaiian Parks- White Settlement, LLC ("HPARKS) which is a subsidiary of Horizon Family Holdings, LLC ("Horizon Family"). Pursuant to the Lease Agreement, HPARKS was given possession of the Park and was charged with its operation. HPARKS was to make semi-annual rent payments to the City.

4. Attached hereto is exhibit "3B", a true, correct and complete copy of the Lease Agreement between the City and HPARKS. This Lease Agreement required rental payments of $500,000.00 due in October 2014; $200,000.00 due in April 2015; and $600,000.00 due in Oct 2015.

5. The Park at White Settlement opened in May 2014. The rental payment due in October 2014 was not timely made. Neither was the rental payment due in April 2015. As the payments were not timely, I was prepared to put HPARKS into default under the Lease Agreement. I recommended to the city manager, Jim Ryan, that the Lease Agreement be put into default and that the City retake possession of the Park.

6. During late 2014 or early 2015, I first became aware of Ben Emmons. Emmons represented to me that he was the managing director of Source Capital, LLC; that Source Capital had injected some $3,500,000.00 into Horizon Family and its subsidiaries; that the Source Capital loan to Horizon Family was in default; that Capital One Bank in Fort Worth, Texas was the principal lender to Horizon Family and its

**AFFIDAVIT OF PHILIP BRAY**                                             **PAGE 2**

604

subsidiaries; and that Capital One's loan to Horizon Family and its subsidiaries was also in default. Emmons represented that he and Source Capital had been authorized by Capital One to reorganize Horizon Family and its subsidiaries' debt. Capital One had agreed to forbear from putting its loan to Horizon Family and subsidiaries into default. Emmons acknowledged that if Capital One had put its loan with Horizon Family and subsidiaries into default and foreclosed on its collateral that Source Capital's debt would be wiped out.

7. During the January through April 2015 timeframe, I had numerous telephone communications and email communications with Emmons and his assistant, Matthew Smith about the financial reorganization issues described above. Emmons represented to me that his office and that of Matthew Smith were located in Atlanta, Georgia. All of the telephonic and email communications I had with Emmons and Smith were received by me at my office in White Settlement, Texas. Attached hereto as Exhibit "3G" are examples of emails sent by Emmons and Smith into the State of Texas.

8. I am familiar with the document attached hereto as Exhibit "3C". This is a true, correct and complete copy of the original document. This document was provided to me by Emmons. The document describes the efforts undertaken by Source Capital to reorganize the Horizon Family and subsidiaries' finances.

9. I also received a copy of Exhibit "3D" from Emmons. This is a true, correct and complete copy of the original document. I specifically requested that Emmons send me Exhibit "3D" to confirm the promises he made to me and the city manager, Jim Ryan, during a meeting we had in Mr. Ryan's office in White Settlement, Texas in March of 2015. In the meeting Emmons specifically represented to us that Source Capital would advance up to an additional $5,000,000.00 to catch up on the Horizon Family and subsidiaries'

financial obligations. Emmons specifically promised that the unpaid vendors that provided services and products to the Park would be paid; that past due rents and future rents through 2015 would be paid; and that the maintenance of the Park would be at the highest level.

10.    In return for benefits described above at paragraph 9, the City of White Settlement promised that it would not put HPARKS into default on the Lease Agreement; that HPARKS would be allowed to continue to possess and operate the Park; and that the City would sign whatever documents were necessary to effect the financial reorganization of Horizon Family and its subsidiaries. In fact, the City did execute a number of consents at the request of Source Capital which are attached as Exhibit "3E". These documents are all true and correct copies of the originals executed by the City.

11.    There were 7 different water parks located in seven different Texas cities which were included in the Hawaiian Falls water park system. These cities include White Settlement, Pflugerville, Waco, Roanoke, Mansfield, Garland, and The Colony.

12.    During the January through April 2015 timeframe, Emmons stated to me that he (Emmons) was having similar meetings and conversations with representatives of all seven Texas cities and that each city would have to cooperate with the financial reorganization of Horizon Family. Emmons further stated that he was successful in persuading the cities to cooperate.

13.    The promises made by Emmons and Source Capital were not kept. Specifically, the October 2015 rent owed to White Settlement was not paid, all of the White Settlement vendors were not paid, and the maintenance at White Settlement did not occur.

14. The promises described above were not kept and have damaged the City of White Settlement.

15. The City purchased all of the personal property used in the operation of the Park. This specifically included all of the arcade games.

16. During Oct 2015, all the arcade games disappeared from the Park. I never gave permission to Emmons, Smith, or anyone else at Source Capital or Horizon Family to remove the arcade games from the Park."

FURTHER AFFIANT SAYETH NOT.



Philip Bray

SUBSCRIBED AND SWORN TO BEFORE ME, on the __29th__ day of August, 2017.

Notary Public in and for the State of Texas

NOTARY PUBLIC
STATE OF TEXAS

STEPHANIE JILL PALKO
My Commission Expires
April 4, 2018

**AFFIDAVIT OF PHILIP BRAY**                                    **PAGE 6**

# APPENDIX TAB "4"

| | | |
|---|---|---|
| CITY OF WHITE SETTLEMENT, TEXAS and the WHITE SETTLEMENT ECONOMIC DEVELOPMENT CORPORATION, | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| Plaintiffs, | §<br>§ | |
| v. | § | |
| | § | 48th JUDICIAL DISTRICT |
| HAWAIIAN PARKS- WHITE SETTLEMENT, LLC, a Missouri limited liability company, BENJAMIN S. EMMONS, SOURCE CAPITAL LLC, a Georgia limited liability company and CLINTON HILL, | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| | §<br>§ | |
| Defendants. | § | |
| | § | TARRANT COUNTY, TEXAS |

## AFFIDAVIT OF JIM RYAN

| | |
|---|---|
| STATE OF TEXAS | § |
| TARRANT COUNTY | § |

BEFORE ME, the undersigned authority, on this day personally appeared Jim Ryan, a person known to me, who, being duly sworn, on her oath states and deposes:

1. "My name is Jim Ryan. I have never been convicted of a crime of moral turpitude. All the statements contained in this affidavit are based upon my personal knowledge and are true and correct.

2. Beginning in September of 2009, I became the Economic Development Director for the City of White Settlement. Starting in December 2014, I became the City Manager for the City of White Settlement, Texas. As the Economic Development Director and then City Manager, I was tasked with supervising all of the municipal functions of the

City of White Settlement including public utilities, code enforcement, fire department, police department, city maintenance, public facilities and parks, as well as the city's roads. I was authorized by the City to enter into contracts on behalf of the City and to assure that these contracts were properly performed.

3. White Settlement entered into a Construction Agreement with Hawaiian Parks- White Settlement, LLC ("HPARKS"). Attached hereto is Exhibit "3A", a true and correct and complete copy of the Construction Agreement. Pursuant to the Construction Agreement, HPARKS was to supervise the construction of a water park, adventure park, and arcade center ("the Park") on property owned by the City. The City was to provide the financing for the construction of the Park as well as all personal property necessary for the Park's operation. To this end, the City borrowed $12,500,000.00. All of this money was expended on construction of the Park. The Park opened in May of 2014, but was not completed until September 2014.

4. The City was the owner of the Park as well as all equipment located at the Park that were necessary for its operation. The City entered into a Ground Lease and Operating Agreement with HPARKS ("Lease Agreement"). A true and correct copy of this Lease Agreement is attached hereto as Exhibit "3B". Pursuant to this Lease Agreement, HPARKS was given possession of the park; the right to operate the Park and obtain money from the operation of the Park. In return, HPARKS was to make semi annual lease payments to White Settlement beginning in October of 2014.

5. Horizon Family Holdings, LLC ("Horizon Family"), an affiliate of HPARKS, operated water parks in 6 other Texas cities in addition to White Settlement. These cities included Pflugerville, Waco, Roanoke, Mansfield, Garland, and The Colony. Each of these other cities had similar lease agreements as that entered into with White Settlement.

**AFFIDAVIT OF JIM RYAN**                                                                 PAGE 2

6. HPARKS failed to pay the lease payment due to White Settlement in October 2014 in the amount of $500,000.00. The City was prepared to exercise its rights under the Lease Agreement which included termination of the lease; terminating HPARKS' rights to operate the Park; and to take over the operations of the Park. The City was prepared to bring any other legal actions necessary to remedy damages caused by HPARKS' failure to pay rent as promised.

7. In December of 2014, I was contacted by Ben Emmons who stated that he was the managing director of Source Capital, LLC. Emmons stated that Source Capital had injected $3,500,000.00 to Horizon Family during 2013 and that Source Capital's debt with Horizon Family was in default. Emmons also stated that the senior lender to Horizon Family was Capital One bank in Fort Worth, Texas and that this debt was similarly in default. Emmons stated that the rental obligations to the other six Texas cities were in default as well, Emmons stated that he and Source Capital were attempting to reorganize the liabilities of Horizon Family and its subsidiaries (including HPARKS) which included: the debt to Capital One, the rents owed to the 7 Texas cities as well as shortfalls in maintenance at the seventh Hawaiian Falls water parks. Attached hereto is Exhibit "3C", a true and correct copy of a document provided by Emmons and Source Capital to White Settlement describing who Source Capital is and what they were trying to accomplish in the financial reorganization of Horizon Family and its subsidiaries.

8. Emmons requested that White Settlement not exercise its rights pursuant to the Lease Agreement described above. Emmons requested that the City cooperate with him and Source Capital in reorganizing the Horizon Family and subsidiaries' financial obligations.

9.      During the period of time from December 2014 through April 2015, I had numerous telephone conversations with Emmons as well as Matthew Smith. Smith was Emmons' assistant. Emmons and Smith told me that Source Capital's offices were located in Atlanta, Georgia. I was always in my office at White Settlement when I talked to Emmons and Smith. The topics I discussed with Emmons and Smith included the following: the Lease Agreement; the amounts owed to the City by HPARKS; and operations of the Park. The principal topic of conversation was how the debt reorganization being advanced by Source Capital could benefit not only Horizon Family and HPARKS, but how the City of White Settlement could benefit as well.

10.     There were also numerous email exchanges between myself on the one hand and Emmons and Smith on the other hand. All these emails were directed to us at our offices in White Settlement. Attached to this affidavit as Exhibit "3F" are examples of emails sent by Emmons and Smith into the state of Texas. The topics discussed in our email traffic was Horizon Family and subsidiaries' debt restructuring.

11.     Emmons made at least 3 trips I personally know of to the State of Texas during the 2015 – 2016 timeframe. Emmons appeared at my office in White Settlement on or about March 22, 2015. He also appeared at my office on December 16, 2015 and at the Park on March 24, 2016.

12.     Emmons told me that he was also communicating with representatives of all of the other 6 cities included in the Hawaiian Falls water park network. He stated that he had visited with other cities while in Texas; and that he made telephone and email communications with each of these cities in the state of Texas. Emmons stated that for the reorganization to work, all 7 cities would have to cooperate.

13. During telephone conversations and face to face meetings, Emmons made the following representations to me and other members of my staff:

   a. If White Settlement agreed to forebear putting HPARKS into default on the Lease Agreement and allow HPARKS to continue to operate the Park at White Settlement, Source Capital would undertake to do the following matters:

      i. Persuade Capital One to forebear on its debt owed by Horizon Family and its subsidiaries;

      ii. Provide sufficient money to pay the trade vendors of HPARKS and bring maintenance of the water parks to the highest standard;

      iii. Source Capital would pay the October 2014 rent to White Settlement as well as the rent accruing in March 2015 and October 2015; and

      iv. Source Capital would pay up to $5,000,000.00 to assure the above-referenced financial commitments could be performed.

14. The promises made by Emmons were made to me and my staff in my office. Phillip Bray, the chief financial officer at the City of White Settlement, requested that Emmons confirm his promises at this meeting. We received the document attached hereto as Exhibit "3D" which is a true, correct and complete copy.

15. Relying on the promises of Emmons and Source Capital, the City of White Settlement did the following:

   a. The City agreed to forebear from exercising its right to put HPARKS into default and take over operations of the Park for a full year.

   b. The City agreed to sign all debt reorganization agreements requested by Source Capital including the various consents attached hereto as Exhibit

"E". These exhibits are all true and correct copies of the original documents approved by the City at Emmons and Source Capital's request.

    c.   The City allowed HPARKS to continue to possess and operate the Park at White Settlement.

16.    All the material promises made by Emmons and Source Capital referenced in paragraphs 13 and 15 above were not kept. Specifically, Source Capital did not pay the $600,000.00 rental payment due in October 2015. Source Capital did pay all of the other Texas cities rents through 2015, only White Settlement was excluded. Also, Source Capital failed to pay the trade creditors of the Park at White Settlement. Source Capital also failed to assure that the Park was properly maintained.

17.    During the summer of 2015, I had numerous telephonic discussions with Emmons and Clinton Hill about the personal property located at the Park. Clinton Hill is the manager appointed by Horizon Family to run the 7 water parks in Texas. I made it very clear to Emmons and Hill that the City of White Settlement paid for and was the owner of all the personal property located at the Park. The City was, therefore, the owner of all the personal property located at the Park, specifically including all of the arcade games.

18.    During October 2015, all of the arcade games as well as other personal property located at the Park were removed from the Park. Neither I nor anyone under my supervision gave permission to anyone to remove the arcade games from the Park. Despite the City paying for the arcade games, Clinton Hill told me that the arcade games were actually leased and were being returned. Nevertheless, Emmons and Source Capital instructed that the arcade games be removed from the Park and sold to defray expenses of other water parks. I vigorously objected to these activities by Emmons and Hill.

**AFFIDAVIT OF JIM RYAN**                      **PAGE 6**

19. The City of White Settlement has been substantially damaged by the wrongful conduct of Emmons, Source Capital, and Hill."

FURTHER AFFIANT SAYETH NOT.

_____
Jim Ryan

SUBSCRIBED AND SWORN TO BEFORE ME, on the ___29th___ day of August, 2017.

_____
Notary Public in and for the State of Texas

STEPHANIE JILL PALKO
My Commission Expires
April 4, 2018

**AFFIDAVIT OF JIM RYAN**                                      **PAGE 8**

617

**APPENDIX TAB "5"**

048-288516-16

## CAUSE NO. 048-288516-16

| | | |
|---|---|---|
| CITY OF WHITE SETTLEMENT, TEXAS and the WHITE SETTLEMENT ECONOMIC DEVELOPMENT CORPORATION, | ) ) ) ) | IN THE DISTRICT COURT |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | 48th JUDICIAL DISTRICT |
| HAWAIIAN PARKS-WHITE SETTLEMENT, LLC, a Missouri limited liability company, BENJAMIN S. EMMONS, and SOURCE CAPITAL, LLC, a Georgia limited liability company, | ) ) ) ) ) ) | TARRANT COUNTY, TEXAS |
| Defendants. | | |

## ORDER ON DEFENDANTS BENJAMIN S. EMMONS' AND SOURCE CAPITAL, LLC'S FIRST AMENDED VERIFIED SPECIAL APPEARANCE

After considering Defendants Benjamin S. Emmons' and Source Capital, LLC's First Amended Verified Special Appearance, any response, Plaintiffs' Original Petition, the discovery on file, affidavits of Benjamin S. Emmons and Matt Smith and arguments of counsel, the Court:

SUSTAINS the special appearance and dismisses Plaintiffs' suit for lack of personal jurisdiction.

SIGNED on March October 2, 2017.



The Honorable David Evans

MAILED COPY TO ALL ATTORNEYS
AND PRO SE PARTIES OF RECORD
10-3-2017

E-MAILED
10-3-2017